[S. F. No. 9319. In Bank.—October 20, 1920.]

E. CLEMENS HORST COMPANY (a Corporation), Petitioner, v. INDUSTRIAL ACCIDENT COMMISSION OF THE STATE OF CALIFORNIA et al., Respondents.

[1] WORKMEN'S COMPENSATION ACT — ADDITIONAL COMPENSATION — SERIOUS MISCONDUCT OF EMPLOYER — MEANING OF TERM.—Serious misconduct of an employer under section 6 (b) of the Workmen's

---

1. "Serious and willful misconduct" of employer as affecting recovery under Workmen's Compensation Act, note, Ann. Cas. 1916A, 790.

Compensation Act (Stats. 1917, p. 834), providing for increased compensation where an employee is injured by reason of serious and willful misconduct of the employer, must be taken to mean conduct which the employer either knew, or ought to have known, if he had turned his mind to the matter, to be conduct likely to jeopardize the safety of his employee.

[2] ID.—WILLFUL MISCONDUCT OF EMPLOYER — MEANING OF TERM.— Serious misconduct of an employer is "willful" under section 6 (b) of the Workmen's Compensation Act if it appears that the circumstances surrounding the act of commission or omission are such as evince a reckless disregard for the safety of others and a willingness to inflict the injury complained of, even though the evidence fails to show positively that the employer had knowledge of the act.

[3] ID.—SERIOUS AND WILLFUL MISCONDUCT OF EXECUTIVE OR MANAGING OFFICER OF CORPORATION EMPLOYER—MEANING OF "OFFICER."— An executive or managing officer of a corporation under section 6 (b) of the Workmen's Compensation Act authorizing increased compensation where an employee is injured by reason of serious and willful misconduct on the part of an executive or managing officer of a corporation is a person in the corporation's employ, either elected or appointed, who is invested with the general conduct and control at a particular place of the business of the corporation.

[4] ID.—INJURY FROM UNGUARDED SHAFTING OF CORPORATION PLANT— SERIOUS AND WILLFUL MISCONDUCT—SUFFICIENCY OF EVIDENCE.— An injury received by an employee of a corporation from coming in contact with a rapidly revolving shaft in its vegetable drying plant is an injury caused by the serious and willful misconduct of the employer for which additional compensation is authorized under section 6 (b) of the Workmen's Compensation Act, where the shaft was constructed and maintained in violation of a general safety order of the Industrial Accident Commission, and it cannot be said from the evidence that the commission in making the award did not infer that the managing officer of the plant had knowledge of such violation and of the dangerous condition of the shafting.

[5] ID.—INCREASED COMPENSATION—CONSTITUTIONALITY OF SECTION OF ACT.—Section 6 (b) of the Workmen's Compensation Act, authorizing increased compensation where an employee is injured by reason of serious and willful misconduct of an employer, is not unconstitutional, since the additional allowance is for additional compensation and not for exemplary damages.

PROCEEDINGS on Certiorari to review an award of the Industrial Accident Commission.   Award affirmed.

The facts are stated in the opinion of the court.

· Edward C. Harrison, Maurice E. Harrison and Arthur W. Bolton for Petitioner.

A. E. Graupner and Warren H. Pillsbury for Respondents.

LAWLOR, J.—This cause is before us on a writ of *certiorari* issued upon the application of petitioner, E. Clemens Horst Company, a corporation, to review an award made on October 24, 1919, by the respondent Industrial Accident Commission in favor of respondent Mrs. La Verne Hamilton, as compensation for injuries sustained by her on June 7, 1919, while in petitioner's employ. The sum of $8.89, payable weekly in advance, was awarded to her against the Ocean Accident and Guarantee Corporation, petitioner's insurance carrier, as "a temporary total disability indemnity," and one-half of that sum, $4.45, also payable weekly in advance, was awarded her against petitioner as additional compensation by reason of the fact, as found by the commission, that her injuries were occasioned by petitioner's "serious and willful misconduct."

The said insurance carrier is not a party to this proceeding, and the only question presented is as to the validity of the award of additional compensation against the petitioner. The latter's contentions are (1) that section 6 (b) of the Workmen's Compensation Act is unconstitutional, and (2) "that even if this section were valid, there is no evidence of 'serious and willful misconduct . . . on the part of an executive or managing officer' of the petitioner corporation, and that therefore the commission was without jurisdiction to make the award."

At the date of the accident Mrs. Hamilton was employed in petitioner's vegetable drying plant near Wheatland, Yuba County, which had been built about three months before. E. Clemens Horst was petitioner's president and general manager. George E. Miller was general superintendent of petitioner's ranches. It appears that he was not a director or stockholder of petitioner. T. L. Conrad was superintendent of the plant at Wheatland, and was neither a director nor a stockholder of petitioner. When Mrs. Hamilton was injured she was working on a small platform raised about two feet from the floor of the plant. It was her duty to

watch a conveyor belt which passed in front of her, and upon which potatoes were being carried from a peeling-machine to a "slicer" about two feet to her left, and to pick out and pare those potatoes which had not been properly treated by the peeling-machine. Directly over and parallel to the conveyor belt, and about five and one-half feet above the platform on which she was standing, was a rapidly revolving shaft which operated the various machines in the plant. This shaft was protected by a board on the side nearest the employee, but was unprotected below. The accident occurred under these circumstances: About 8 P. M. the mouth of the "slicer" at Mrs. Hamilton's left became clogged. Leaning over the belt and under the shaft, she reached out to clear the potatoes away from the "slicer." In this position her hair was caught by the shaft and pulled from her head, so that she was completely scalped. It is admitted by petitioner that "the accident happened in the course of her employment, and no question is made of her right to recover compensation."

1. We shall first consider petitioner's claim that the finding that the injury was caused by the employer's serious and willful misconduct is not supported by the evidence. Section 6 (b) of the Workmen's Compensation Act (Stats. 1917, p. 834; Deering's General Laws, Consol. Supp. 1917–19, Act 2143c, p. 1392), as it stood at the time of the accident, read in part: "Where the employee is injured by reason of . . . serious and willful misconduct . . . on the part of an executive or managing officer [of a corporation], the amount of compensation otherwise recoverable for injury or death, as hereinafter provided, shall be increased one-half . . . ; *provided, however,* that said increase of award shall in no event exceed twenty-five hundred dollars."

The commission has found on this point: "8. That at the time of said injury, the employer was a corporation, that the employer by its executive and managing officers constructed said plant and placed therein the transmission shafting upon which applicant was injured, parallel to and directly over the belt upon which applicant worked, at a height on a level with her eyes and without any guard or protection on the under side thereof. That applicant's work required her to bend forward with her head beneath said shafting, and it was necessary for her to stoop to do so;

that her hair was thereby brought into close proximity to the unguarded portion of said shafting, which was at all times revolving rapidly. That said shafting was at all times herein mentioned maintained in said condition by said employer through its executive and managing officers and by said Miller and Conrad. That said construction and maintenance were and each of them was a direct and open violation of the provisions of sections 33, 34, 35, and 36 of the Workmen's Compensation, Insurance and Safety Act of 1917. That the duty owed by said employer and its executive and managing officers to employees, under the said provisions, cannot be delegated by them or any of them so as to free them or any of them from responsibility for the violation of said duty, and under the ruling in the case of *Fidelity & Deposit Co. of Maryland* v. *Industrial Acc. Com.,* 171 Cal. 728, [L. R. A. 1916D, 903, 154 Pac. 834], constituted serious and willful misconduct on the part of said employer. That said serious and willful misconduct was the proximate cause of said injury.

"That said construction and maintenance were further in violation of General Safety Order No. 6 (a) of the Industrial Accident Commission, then in full force and effect, which provides that: . . . 'All transmission shafting, either horizontal or vertical, in workrooms . . . and located within seven feet of the floor or platform, must be guarded.'

"That said violation of said safety order constituted serious and willful misconduct on the part of the executive and managing officers of said corporation, and of said corporation, and was the proximate cause of said injury.

"That therefore applicant is entitled to have her compensation for said injury increased one-half under section 6 (b) of said act, said increase to be paid by said employer, and not by said insurance carrier."

The question, then, is: Does the evidence sustain this finding?

Mrs. Hamilton testified that she had been engaged in this particular work for ten days prior to the accident; that on the day in question two foremen had told her "to watch to see that it [the belt] didn't stop up at the end," where it dumped the potatoes into the "slicer"; that she could not reach that end of the belt without stooping under the shaft; that when she commenced to work at this plant she had been

told "the general nature of the work, but not just what I was to do"; that she had not seen any signs on the premises warning employees against approaching the machinery; and that she had not "tried to take potatoes out of the slicer" except on the occasion when she was injured.

Mrs. Daisy Cope testified that she had been working on the same belt as Mrs. Hamilton; that the revolving shaft which caused the latter's injuries was "right over the belt" on a level with her eyes; that no one had called her attention to any danger signs in the plant and that she had seen none; that prior to the accident she herself had felt the suction from the revolving shaft tugging at her hair, but had not spoken about it to her fellow-employees; that she had not been warned "to look out for the shaft"; that "the shaft is right over the belt, and if you are not careful you would raise up under it"; that the board protecting the shaft on the side nearest her was "right even" with her head; that there was sufficient distance between the shaft and the belt at the point where the witness worked so that her hair would not become entangled in the shaft unless she leaned over the belt, but that the belt ran "upward" as it approached Mrs. Hamilton's position, "and it was closer to the shaft there than it was where I was."

Mrs. A. M. Parker stated that at the time the applicant was injured she was "forelady, overseeing the work"; that she had not instructed Mrs. Hamilton "to be careful or about the machinery in any way"; that she did not remember seeing any warning signs in the plant; that the "slicer" frequently became clogged; that she did not know whose duty it was to clear the machine in such cases, but that the "day-boss" had told Mrs. Hamilton to do so; that in order to do so she would have to lean over the belt so that her head "came right under the shaft"; that within a few days after this accident the shaft was boxed in; that she (the witness) had a pole which she often used to clear potatoes from the "slicer," but that this was not generally known among the employees, and that "the most of the time I used it was after she got hurt"; and that the pole was not located so that Mrs. Hamilton could use it. When recalled by petitioner she admitted that no instructions had been given to anyone except to the applicant to clear the "slicer," and stated that she herself had not been told to do it until after

Mrs. Hamilton was injured, but that during the ten days prior to the accident she frequently used the pole to keep the mouth of the machine clear.

Mrs. Marion Sherman, who was working about five feet from Mrs. Hamilton when the latter was hurt, testified that she had not been instructed as to whose duty it was to keep the "slicer" clear, but that "anyone who was working on that end of the belt, right there, they was to keep the potatoes moving"; that she, too, had noticed the effect of the shaft on her hair when she stood erect; that the shaft was about two and one-half feet above the belt; and that anyone working in front of the belt would naturally stoop under the shaft in order to reach the mouth of the "slicer."

T. L. Conrad, testifying for petitioner, stated that he was "fairly familiar" with conditions at the plant; that the distance between the shaft and the platform on which Mrs. Hamilton was working was about five and one-half feet; that after the accident the shafting was boxed in at his direction; that one Boyd was the night foreman at the plant under him; that the "slicer" occasionally became clogged; that it was Mrs. Parker's duty to keep it clear, and not the duty of an employee stationed where Mrs. Hamilton was; that he did not know whether or not his foremen, who were "supposed to instruct these employees when they went to work about their duties," had given these or other instructions; that "we had signs up in regard to the safety of the machinery"; that, so far as he knew, Horst himself had no knowledge of the dangerous position of the shaft; that the surface of the shafting was smooth; that he had never seen "any woman working in the same position Mrs. Hamilton was cleaning the slicer"; that "she had no business there," clearing the mouth of the machine; and that a woman working "below" Mrs. Hamilton on another belt had been instructed by him and by the foreman to keep the "slicer" from becoming clogged. On cross-examination he stated that prior to the accident he had frequently noticed the position of the shaft; that he had been on the platform where Mrs. Hamilton worked, and had seen that the shaft was "open underneath and on the back," although there were two boards "in front"; that he had never called the attention of Horst or Miller to the position of the shaft; that he had never told any other foreman "to cover it up or box it

in"; that he thought Horst was in the east and had not been in the plant before the accident; and that he himself had considered the plant "as ready to run and absolutely safe."

George E. Miller, also a witness for petitioner, testified that he had inspected the Wheatland plant "simply in a general way by going through it and seeing it in operation. The instruction to the builders at the time it was built was to house in everything they considered dangerous. . . . I know that we didn't consider it was necesary to inclose shafts where the shaft was over the belt, so that one would have no business to be in there. Of course, there are dangerous places in any plant or any machine when you get in that dangerous position, but we didn't consider it was necessary to put boards underneath the shaft where the shaft was back of or over the conveyor." He further testified that the plant had not been built from plans or specifications, but from general instructions; that he had never made a special survey of the plant; that he frequently visited the various ranches under his supervision and "had them make changes wherever I thought they were necessary"; that he had seen the revolving shaft, but had not noticed there was no guard underneath it; and that "the handling of the plant and operation of it" was left to Conrad.

Horst testified that he had given Miller instructions "to look out for the safety" of the employees; that no report had been made to him as to any dangerous conditions in this plant; that he knew practically nothing of the exact condition of the works other than as he was advised by Miller and Conrad; that prior to the injury his attention had not been called to this shafting, although on many occasions he had been through the plant "in a casual way"; and that his custom was to give Miller "general instructions" and "leave it up to his judgment to see that the work is carried out." As to Miller's powers as superintendent he stated "he has got no authority except what authority I gave him."

Miss Viva Jessup, who worked next to Mrs. Hamilton, stated that she had not known of any instructions being given to anyone as to the cleaning of the "slicer"; that she did not remember seeing any "safety signs" in the building; and that she had never heard anyone say that the shaft was in a dangerous position.

Subdivision (2) (a) of section 1 of the English Workmen's Compensation Act of 1906 (6 Edw. VII, c. 58) provided that if the injury to an employee "is attributable to the serious and willful misconduct of that workman, any compensation . . . shall, unless the injury results in death or serious and permanent disablement, be disallowed." In discussing what is meant by "serious and willful misconduct," Beven, in his "Workmen's Compensation," page 394, considers separately the terms "serious" and "willful," and we think our consideration of the evidence may properly be thus divided.

[1] The first question presented is, then, Was the commission justified in finding that the petitioner was guilty of "serious misconduct"? There is no statutory definition of this term. In this connection we may again quote from Beven, page 401: "To constitute 'serious misconduct,' it is probable that the legislature intended to signify conduct that an average workman in being guilty of, either would know, or ought to know, if he turned his mind to consider the matter, to be conduct likely to jeopardize his own and his fellow-workman's safety." In our opinion the serious misconduct of an employer under our statute may be similarly defined. There should be no difference in principle between the degree of care required of an employer and that exacted from an employee. "Serious misconduct" of an employer must, therefore, be taken to mean conduct which the employer either knew, or ought to have known, if he had turned his mind to the matter, to be conduct likely to jeopardize the safety of his employees. It seems clear that, according to this test, the commission was amply warranted in finding that the maintenance of the improperly protected shafting, immediately over and in close proximity to the conveyor belt, was such serious misconduct. Mrs. Hamilton's testimony that she had been instructed to keep the belt and the "slicer" clear is uncontroverted, and it plainly appears from the testimony of the other employees that in order to do so it was natural that she should lean over the belt, thereby bringing her head in dangerous proximity to the revolving shaft. Mrs. Sherman testified that it was the custom in the plant for the employee who worked in Mrs. Hamilton's position to "keep the potatoes moving," and she and Mrs. Cope stated that they had frequently felt the suction

of the revolving shaft tugging at their hair.  From the evidence which we have summarized we cannot hold that the commission was not justified in finding that the place at which the employee was required to work was unsafe. Under the evidence the finding of serious misconduct implies that the conditions of the employment were patently unsafe. If this be true, we know of no rule under which petitioner may claim that, passing for the time being the question of the penalty, it is not primarily liable for resulting injuries. It is so well settled as to require no citation of authority that petitioner was charged with the duty of maintaining a safe place for its employees to work, and we do not think it can be said the evidence is insufficient to establish serious misconduct in that petitioner's officers knew, or ought to have known, if they had turned their minds to consider the matter, of the conditions under which Mrs. Hamilton was required to work.

[2]  Next, as to whether such serious misconduct was "willful."  It has frequently been said that willful misconduct involves the *knowledge* of the person that the thing which he is doing is wrong.  (*Lewis* v. *Great Western Ry. Co.,* L. R. 3 Q. B. Div. 195; *In re Burns,* 218 Mass. 8, [Ann. Cas. 1916A, 787, 105 N. E. 601] ; *Riley* v. *Standard Acc. Ins. Co.,* 227 Mass. 55, [116 N. E. 259] ; *Beckles' Case,* 230 Mass. 272, [119 N. E. 653].)  Conceding that knowledge is required, it seems to us that in order to prove the requisite knowledge, it is not necessary for the evidence to show positively that the person was notified of the unsafe condition of his premises, but that it is sufficient if it appears that the circumstances surrounding the act of commission or omission are such as "evince a reckless disregard for the safety of others and a willingness to inflict the injury complained of." (*Louisville etc. Ry. Co.* v. *Bryan,* 107 Ind. 51, [7 N. E. 807].  See, also, *Pittsburgh C. C. & St. L. Ry. Co.* v. *Judd,* 10 Ind. App. 213, [36 N. E. 779].)  According to the findings the failure to guard the shafting was in direct violation of a general safety order of the commission.  It is not contended that the making of this regulation was not within the power of the commission, and, by sections 48 and 49 of the Workmen's Compensation Act, such orders "are conclusively presumed to be reasonable and lawful."  In the face of the evidence it cannot be held that the finding that petitioner was guilty

of serious and willful misconduct in maintaining the unguarded shafting is without support.

[3]  It only remains to consider in this connection whether such misconduct was that "of an executive or managing officer" of petitioner.  It is to be noted that section 12, subdivision (b) of the act of 1913 (Stats. 1913, p. 283) specified that the willful misconduct of a corporate employer which should entitle an injured employee at his option either to claim compensation under the act or to sue at law for damages must be that of an *elective* officer.  This provision was repealed by the act of 1917, *supra*, and under the corresponding section of that statute—the section here under consideration—the willful misconduct which entitles the injured employee to additional compensation is that of an executive or managing officer of a corporation.  It is significant that in this section it is not prescribed that such misconduct be that of an *elective* officer, and it is to be presumed that in enacting the act of 1917 the legislature was fully advised of the changes being made in the language of the corresponding provisions of the act of 1913.  Under the prior statute an injured employee, in order to recover for the willful misconduct of his corporate employer, was required to bring home such misconduct to an *elective* officer.  Under the 1917 statute, however, the legislature has seen fit to require that a corporation shall be liable for the willful misconduct of an executive or managing officer, and has not specified that the officer shall be an elective one.  It seems clear, therefore, that the legislature by this section did not use "officer" in its technical, legal sense as one who has been elected, or whose office is provided for by the articles of incorporation, or the by-laws, but that by an "executive or managing officer" was meant a person in the corporation's employ, either elected or appointed, who is invested with the general conduct and control at a particular place of the business of a corporation.

Applying this reasoning to the facts herein, it is plain that Conrad was a managing officer of the petitioner, for whose willful misconduct the company is responsible.  The by-laws were not introduced in evidence, and it cannot be determined from the record whether Conrad was elected or appointed as manager of the Wheatland plant.  But, as has been shown, Miller testified that the operation of the

Wheatland plant was entirely intrusted to Conrad. According to the testimony of Conrad himself, he knew of the position of the shafting and had been on the platform where the injury was received; that he observed it was "open underneath and on the back"; that he neither remedied the conditions nor reported them to his superiors; that immediately after the accident the shafting was boxed in at his direction; and that as superintendent he was fairly familiar with conditions in the plant. It is not necessary in order to support the finding that there be direct evidence that Conrad knew of the dangerous condition of the premises and *intentionally* failed to remedy it; it is sufficient if the existence of either his knowledge or intention, or both, may be inferred. The commission may have decided that Conrad could not have failed to observe that an operator tending the belt was in perilous proximity to the unguarded shafting. From all the evidence we cannot say the commission may not have inferred that he must have known of the dangerous conditions of the employment. If he did, as matter of law he would be guilty of willful misconduct if he failed to take proper precautions to remove the danger. It may be observed that if Conrad's testimony as to whether he knew of the situation is to be accepted, the conclusion is inevitable that petitioner in the operation of the plant failed to place responsibility for the working conditions upon anyone. In any event, we are not prepared to hold that the superintendent of the plant is not to be charged with knowledge of conditions which are in gross violation of prescribed safety regulations, or that under the evidence he is not "an executive or managing officer" within the meaning of the statute.

[4] And it is only necessary to refer to the testimony of the various employees that the unguarded shafting was on a level with Mrs. Hamilton's eyes, that several of the employees themselves had felt the suction from the shaft, that Mrs. Hamilton had been instructed to clean the "slicer," and that in so doing it was to be expected she would lean over the belt and under the shaft, in order to justify the conclusion of the commission that her injuries were due to the dangerous conditions under which she was required to work. It must be held, therefore, that the evidence is sufficient to sustain the finding that the accident was the result

of the "serious and willful misconduct of an executive or managing officer" of petitioner.

[5] 2. We now turn to consider petitioner's claim that section 6(b) is unconstitutional. The constitution, as it stood at the time the legislation in force on June 7, 1919, was enacted, empowered the legislature to create a liability on the part of employers "to compensate their employees" for any injury received in the course of their employment, "irrespective of the fault of either party." (Art. XX, sec. 21.) This language does not authorize the creation of a liability for anything more than *compensation.* If the fifty per cent to be added in cases where the injury is caused by the willful misconduct of the employer is given as a penalty for such misconduct, and not as compensation to the employee for his injury, the provision is not within the power given to the legislature by said section, and if it has no other sanction, it is beyond the legislative power and void.

It would be within the general power of the legislature, under section 1, article IV, to provide that in any case of injury to an employee from willful misconduct of the employer, the amount found as the actual damage sustained by the employee should be increased by adding fifty per cent thereto as a penalty for the misconduct and by way of exemplary damages. But that part of the award would not be given as compensation, and the jurisdiction to enforce the liability for the exemplary damages would be in the ordinary courts established by section 1, article VI, of the constitution. That section vests the whole judicial power of the state in the courts there mentioned, except such as may be placed in other tribunals by the subsequent constitutional amendments providing for the giving of special powers of a judicial nature to the Railroad Commission and to the Industrial Accident Commission. (Art. XII, secs. 22 and 23; art. XX, sec. 21.) Section 21, article XX, does not authorize the legislature to commit to the accident commission the enforcement of any liabilities except those created by it against employers to the employees for *compensation* for injuries. (*Pacific Coast Casualty Co.* v. *Pillsbury,* 171 Cal. 319, [153 Pac. 24]; *Western Metal Supply Co.* v. *Pillsbury,* 172 Cal. 413, [Ann. Cas. 1917E, 390, 156 Pac. 491]; *Carstens* v. *Pillsbury,* 172 Cal. 572, [158 Pac. 218].) Hence it does not authorize the giving of jurisdiction to enforce a liability for punitive damages, not given as com-

pensation, but as something over and above compensation for the injury.

But the provision in question is founded upon a different theory. It is obvious from the language of sections 6 and 9 of the act of 1917, *supra,* and from the act as a whole, that the ordinary schedule of compensation there established was not considered to be full and complete compensation for the injuries received. The purpose was to take a part of the burden imposed by the injury from the injured employee, and transfer that part to the employer to be ultimately borne by the community in general as an addition to the cost of production. In *Western Indemnity Co.* v. *Pillsbury,* 170 Cal. 693, [151 Pac. 398], three of the justices of the court, in upholding the constitutionality of the act, said, with regard to the compensation allowed to employees in addition to medical and surgical expenses, that the indemnity based upon the loss of earnings "covers not the whole, but only a part or a percentage of such loss. The risk of actual injuries is thus shared by employer and employee." The opinion of the other three justices upholding the act for somewhat different reasons confirms the foregoing statement. All presumptions are to be indulged in favor of the validity of an act of the legislature. It is, therefore, to be presumed the legislature found that the actual injury by loss of earnings and other elements of damage, not including expenses for costs of treatment and the like, would be at least fifty per cent more than the fixed schedule would come to, and that it was deemed just if the injury was caused by willful misconduct of the employer he should be made to pay a greater proportion of the burden, and that the allowance in such a case should be increased by adding fifty per cent thereto. Thus considered, the additional allowance is really for additional compensation in the strict sense, and not for exemplary damages. This being the case, the power to enforce it was properly given to the commission under the provisions of section 21, article XX, of the constitution.

The award is affirmed.

Shaw, J., Olney, J., Wilbur, J., Lennon, J., Angellotti, C. J., and Sloane, J., concurred.

Rehearing denied.

All the Justices, except Angellotti, C. J., concurred.