[Civ. No. 15403.   Second Dist., Div. Three.   Jan. 27, 1947.]

VEGA AIRCRAFT CORPORATION (a Corporation), Petitioner v. INDUSTRIAL ACCIDENT COMMISSION and ABE ELOM BOWLIN, Respondents.

Syril S. Tipton for Petitioner.

R. C. McKellips and Edward A. Sarkisian for Respondents.

DESMOND, P. J.—On May 17, 1943, Abe Elom Bowlin, while working as a riveter for petitioner Vega Aircraft Corporation at Fresno sustained an injury causing permanent partial disability consisting of the loss of his right eye. For this disability the Industrial Accident Commission held that he was entitled to normal compensation in the sum of $2,449.92 and assessed its award in that amount against Associated Indemnity Corporation, insurance carrier of Vega Aircraft Corporation, providing also for any medical treatment required to cure and relieve Bowlin from the effects of his injury, including the furnishing and placing of an artificial eye. At the same time the commission made an additional award under section 4553 of the Labor Code in favor of Bowlin against Vega Aircraft Corporation in the sum of $1,224.96 (one-half of the normal compensation), holding in its findings that his injury was proximately caused by the serious and wilful misconduct of his employer.

Upon petition of Vega Aircraft Corporation we have reviewed this latter award and have concluded that it should stand. There is no dispute between the parties as to how the accident occurred. Bowlin, at the time, was working with his riveting partner, Raymond Hartman. These men alternated in their work as riveter and bucker and on the day of the injury were working upon a piece of machinery known as an aluminum wing journal. As one man drove rivets into this piece of machinery the other man held his bucking-bar against the reverse side in such a position as to cause the soft head of the rivet to spread and thereby become secure. When Hartman finished riveting from his side he started to pass the rivet-gun to Bowlin. Bowlin laid down his bucking-

bar and reached under the table to receive the rivet-gun. While it was being passed the trigger caught on something and operated the mechanism which permitted an inrush of air to the gun. This caused the rivet-set to fly out and strike Bowlin in the face. He was wearing glasses at the time, the right lens was broken and pieces of glass entered his right eye causing the injury which subsequently necessitated enucleation of the eye. Only slight pressure was necessary to operate the rivet-gun. Its accidental operation could be prevented by means of a detachable coil spring fitting over the barrel of the gun. This spring is known as a safety-spring and in the operation of the petitioner's business is detached when returned to the tool-crib after each day's use and reissued as needed. Bowlin testified that on the morning of the day that he was injured he asked for a safety spring at the tool-crib and was told that they were on order but none had been received and none were available. He had been using the rivet-gun for about three weeks and during that time had never had a safety-spring although he had asked for one at the tool-crib on several occasions, each time being told that the springs were on order but that none were available, the order not having been filled.

Petitioner contends that Bowlin could have prevented the accidental operation of the gun if he had used a rubber band in place of the safety spring or had held his hand over the barrel hole of the gun. Certain witnesses produced by the petitioner testified that during a two weeks' instruction course given by Vega Aircraft Corporation, the employees, including Bowlin, were instructed to use these precautions when a safety spring was not available. Bowlin, however, denied that he had ever been told of these alternative safety measures. Hartman testified that he had not presented a requisition for a safety spring, never having received instructions as to operating a riveting-set without one; further, that he had never received instructions concerning the use of rubber bands to hold the riveting-set in place. The group leader of these men, one McClintock, testified that on the day of the accident they had no retaining spring; that Bowlin had asked him if any had arrived; that previously under instructions of Odell, the supervisor, he had advised Bowlin and Hartman that there was danger, ''These A V 13 guns very easily trip the trigger,'' and had told them to remove the rivet-set when they were not using the rivet-gun. This rivet-set is described as a piece of

steel, shaped like a twenty-two bullet and used, according to our understanding, for driving home the rivets. Mr. McClintock further testified that at no time during the month of May, 1943, when Bowlin was a member of his group, did he ever see any of the rivet-guns operated with rubber retainers; that before Bowlin's injury he, McClintock, had never heard of one, had never received any instructions or issued any with reference to them.

The defendants produced as a witness a Mr. Hatton, who testified that he was Chief Safety Engineer of the Lockheed Vega Aircraft Corporation and, as such, had occasionally demonstrated a hand-riveting gun when he had no spring and in lieu thereof used a rubber band. He stated that with the rubber band in place "[T]he set attempts to leave the gun. It does leave the gun for about an inch and then the resiliency of the rubber begins to take place and prevents the set from flying, and the set merely goes out of the gun and flops underneath the gun. Q. In May, 1943 what was the situation insofar as these set springs were concerned in the Lockheed plant? A. Well, at that time we were in the midst of a very heavy aviation program and this plant was one of them, and we were having difficulty at that time in obtaining an adequate supply of these springs, due to the critical shortage of these materials. Q. What was the purpose of the rubber band? A. The purpose of the rubber was to make the operation safe in the absence of the springs. Q. Since you could not get the springs? A. That is right." Inquiry was made of this witness concerning the use of plastic face-shields such as Bowlin wore at the time of his injury. He stated that his employer published and circulated a booklet of safety rules covering the use of face-shields, specifically outlining various functions in which eye protection should be used. "Q. With reference to flying metal? A. Flying objects. Q. Such as grinding operations? A. That is correct. Q. Normally in a riveting operation there is no flying object, is there? A. Normally no."

Bowlin testified that he was never furnished with the safety booklet or a book of safety rules; that he did not read one which his wife, also an employee of Vega, testified she picked up to read when they were passed around "after my husband got hurt . . . it said to always wear goggles or face shield in drilling or filing where there are pieces of small nature." In his statement before the referee, Bowlin testified that the face-shield which he wore was over his face and down over his

eyes. "Q. And did this trigger go through the face shield? A. No, sir, it didn't. Q. Then how did it hit your eye? A. It knocked it off my head when it hit my glasses. I had my glasses on, that plunger hit me in the face shield, breaking my glasses in my eye. Q. Did not break the face shield? A. No, sir. Q. Did not mark it at all? A. I don't know whether it did. I didn't go to see it. Q. As a matter of fact, that face shield was up when this accident occurred, wasn't it? A. No, sir, it wasn't. Q. You told the nurse that it was up right after the accident? A. I don't think I did." The industrial nurse testified that she talked to Bowlin immediately after the accident. "I asked him if he had his shield on and he said yes, he had it on, but it was up." According to the witness Hatton, this shield was made of plastic so strong that it would not break upon a rivet-set striking it. Hartman, Bowlin's drilling partner, was asked "If Mr. Bowlin was wearing a rivet mask at the time of the injury, was that mask in position over his face, or was it in a raised position," and answered, "Raised over his head. We weren't required to have them in position except when drilling or rodding or filing." McClintock testified that before Bowlin's accident he had not seen rubber bands used in connection with the operation of the air-gun; that he gave no instructions to anyone working under him with regard to the use of such bands, and that at no time did he receive any instructions from anyone with respect to the use of such rubber substitute for a safety-spring. One of the petitioner's witnesses, Richard Kelley, conducted the instruction classes for new employees and while he testified that he told the workers that they were to use a rubber-band when a spring was not available, he testified that he had never heard Hubbard, who was in charge of the tool-crib, advise anybody that a supply of rubber bands was available for use as substitutes for the safety springs. He had, however, heard Hubbard advise men that the safety springs were on order but had not been received. There was no showing as to when the order for the safety springs was placed, nor of any diligence on the part of the employer to obtain the springs either from the source ordered or some other.

In the Findings of Fact made by the Industrial Accident Commission, based upon the report of the referee, serious and wilful misconduct on the part of the employer was found to have existed (a) by failure to provide Bowlin with an adequate safeguard to prevent rivet-sets from flying out of the

rivet-gun, (b) from failing to instruct in, and to enforce, at all times while handling rivet-guns, the full use of safeguards that were provided, (c) that the employer, through its executives, managing officers and general superintendents, knowingly and wilfully failed and neglected to exercise the caution which a prudent employer would have exercised in preventing the ejection of rivet-sets at times when the nozzle of the rivet-gun could not be held against a stationary object.

It is apparent from these findings that the commission did. not adopt the view urged by petitioner that Bowlin's injury was caused by his failure to wear his mask in a position to protect his eyes. The argument that he was careless in that regard might be considered sufficiently refuted by the evidence that eye protection was to be secured only when work such as filing or grinding was under way, when small particles were flying in the air or when the work was such that flying objects were normally to be expected. But petitioner concedes, as it must in view of the language used in section 3600, Labor Code, that contributory negligence is not a defense to a compensation claim and in our opinion if Bowlin's actions or failure to act constituted negligence that cannot serve so far as his employer's misconduct is concerned "to mitigate the authorized severities of the law."

As a final protest against the claimed unfairness of the award, counsel for petitioner calls our attention to that portion of section 4553, Labor Code, which provides for increased compensation "where the employee is injured by reason of the serious and wilful misconduct of any of the following: . . . (c) If the employer is a corporation, on the part of an executive, managing officer, or general superintendent thereof." He declares that "there was no evidence whatever in the case at bar that the alleged wilful misconduct, assuming but not conceding that there was such, was either committed by or acquiesced in by an executive, managing officer or general superintendent," and argues that under the reasoning of *Bechtel etc. Corp.* v. *Industrial Acc. Com.* (1944), 25 Cal.2d 171 [153 P.2d 331], the commission should have rejected Bowlin's claim for the increased compensation. But on the facts of this case, we take a contrary view, having in mind particularly sections 6401 and 6403 of the Labor Code. The latter section provides that "No employer shall fail or neglect: (a) [*Safety devices and safeguards.*] To provide and use safety devices and safeguards. (b) [*Adequate methods and*

*processes.*] To adopt and use methods and processes reasonably adequate to render the employment and place of employment safe. (c) [*Other things.*] To do every other thing reasonably necessary to protect the life and safety of employees." In the instant case we note that Mr. McClintock, Bowlin's group leader, under instructions received from Odell, "the supervisor," had told Bowlin and Hartman to remove the rivet-set when their rivet-gun was not in use, but he, McClintock, failed to tell them to use the rubber-band substitute for the safety spring. He stated that he never saw one used while Bowlin was working under him, had never heard of one, or received any instructions from Odell or anyone else concerning them, nor had he issued any instructions with reference to them. Mr. Hatton, however, was very familiar with the rubber band substitute, knew their purpose "was to make the operation safe in the absence of the springs" and testified that "they have always been used in the aircraft business." Yet although he was the chief safety engineer of the plant where Bowlin worked he failed, so far as the record discloses, to do a number of things that might be considered "reasonably necessary to protect" the safety of employees there employed, as required by subsection (c), section 6403, Labor Code, *supra*. He might have told Clifford Hubbard, who was in charge of the tool-crib never to issue a rivet-gun without a rubber band as substitute for a safety spring, or he might have directed Hubbard to offer a rubber band to every man applying for a safety spring when none were available. There is nothing in the record to indicate that he ever took such steps, but we do know that Mr. Kelley testified that he never heard Hubbard advise the men who applied for safety springs that there was on hand a supply of rubber bands. Another instance which indicates a lack of proper interest in the employee's protection is the circumstance that he never received a booklet with safety rules, nor was there any showing that the booklet which Mrs. Bowlin picked up after her husband's accident made any reference to the use of a rubber band as a safety device on a rivet-gun in lieu of a missing safety spring.

The referee who heard the testimony in this case and visited the plant where the accident occurred indicated in her report her reliance upon *E. Clemens Horst Co.* v. *Industrial Acc. Com.* (1920), 184 Cal. 180 [193 P. 105, 16 A.L.R. 611]. In that case at page 183 we find the following statement: "The

commission has found on this point: '8. That at the time of said injury, the employer was a corporation, that the employer by its executive and managing officers constructed said plant and placed therein the transmission shafting upon which applicant was injured. . . .' '' In the instant case the commission made a finding that ''At the time of the injury to the employee the employer, through its executives, managing officers and general superintendents, knowingly and wilfully failed and refused and neglected to provide said employee . . . an adequate safeguard to prevent rivet sets from flying out of the rivet gun . . . failed to instruct in, and to enforce, the full use of, at all times while handling riveting guns, safeguards that were provided . . . failed and neglected to exercise the caution which a prudent employer would have exercised in preventing the ejection of rivet sets. . . .'' It will be noted that in neither case does the commission mention the individual primarily responsible for the failure to adopt and use the proper safeguards, but in the cited case the court asserted that ''it is plain that Conrad was a managing officer of the petitioner, for whose wilful misconduct the company is responsible,'' while in the case before us the referee, upon whose report the commission based the award, made a finding that ''The safety engineer was general superintendent for the employer'' and ''[T]he failure to furnish substitute safeguards and to give and enforce definite and specific orders with respect to using such substitute and other safeguards while handling rivet guns constitutes serious and wilful misconduct of a general superintendent and therefore of the employer.'' While Mr. Hatton presumably was not the general superintendent in charge of construction, it clearly appears that as to the adoption and use of safety measures and devices he had the power and the duty which attach to general superintendence.''

The award is affirmed.

Wood, J., concurred.

SHINN, J.—I concur in the judgment. It would have been serious and wilful misconduct on the part of the employer to fail to provide safety springs for use on the rivet guns when springs were available. It was equally necessary to provide rubber bands when springs were not available. The evidence that rubber bands were provided during the period when there were no springs on hand was uncertain and unsatis-

factory, consisting of the testimony of Mr. Kelley, the class instructor, who testified that there were rubber bands in the tool crib ''because we were using them in the class room,'' and the testimony of Katherine L. Rockas that she had obtained rubber bands at the tool crib many times. The tool department manager was Charles Lucas. The employee in charge of issuing and collecting tools was Clifford Hubbard, who was still employed at the plant at the time of the hearing. Mr. Kelley testified that about the date of the accident he had heard employees ask Hubbard for springs and that Hubbard had replied that they were unable to furnish them but had not told the employees that he had rubber bands. Neither Lucas nor Hubbard was called as a witness, although they were the ones who would have been in the best position to testify upon the critical point in issue, namely, whether the employer issued to the employees rubber bands when no springs were on hand. The failure to call these witnesses warranted an inference that their testimony on the point would have been adverse to the employer. It was a justifiable inference from the evidence as a whole that the employer failed to furnish rubber bands, which had been commonly used in the industry for many years as a safety device.

The referee found that although Bowlin had the safety mask on his head at the time of the accident, it was shoved up so that it did not protect his eyes. This was the only reasonable conclusion to be drawn from the evidence. It was shown by demonstrations to the referee that the rivet set, which was of tempered steel about three-eights of an inch thick and three or four inches long, when shot against the safety shield did not break it, depress it, or even scratch the surface of it. The shield would have protected Bowlin from eye injury if he had had it over his eyes.

Petitioner argues from this state of facts that the proximate cause of the accident was the failure of Bowlin to wear the shield over his face, and not the absence of a spring or rubber band. We assume that petitioner contends that it was the sole proximate cause. Petitioner does not question the award of compensation upon this ground, but only the additional award for serious and wilful misconduct, although if the point were well taken as to one, it would be as to both, and the entire award would be erroneous. But it is not well taken. There were two proximate causes of the accident, the absence of a spring or rubber band and the improper wearing of the

shield, but both were related to the employment, the injury was proximately caused by the employment, it was not caused by the intoxication of the employee, was not intentionally self-inflicted, and therefore, under section 3600 of the Labor Code, the employer was liable for the payment of compensation. If it is the petitioner's contention that serious and wilful misconduct of an employer bearing no causal relation to the injury will not justify an increased award, it poses a question which is not involved in this proceeding.