185 So.2d 232 (1965)
Herman THIBODEAUX, Plaintiff-Appellee-Appellant,
v.
PARKS EQUIPMENT COMPANY et al., Defendants-Appellees-Appellants (Except Hartford Accident & Indemnity Company-Appellant).
No. 6450.
Court of Appeal of Louisiana, First Circuit.
November 16, 1965.
Writs Refused February 4, 1966.
On Rehearing April 4, 1966.
Writ Refused May 19, 1966.
*234 E. Leland Richardson, of Dale, Richardson & Dale, Baton Rouge, for Hartford Accident & Indemnity Co., Charles W. Lane, III, of Jones, Walker, Waechter, Poitevent, Carrere & Denegre and John V. Baus, for Dover Corporation, M. Truman Woodward, Jr., of Milling, Saal, Saunders, Benson & Woodward and Bernard J. Caillouet and Peter R. Monrose, Jr., New Orleans, for Humble Oil & Refining Co., R. Gordon Kean, Jr., of Sanders, Miller, Downing, Rubin & Kean, Baton Rouge, Bean & Manning, Houston, Tex., for Parks Equipment Co.
Wallace A. Hunter, of Durrett, Hardin, Hunter, Dameron & Fritchie, Baton Rouge, Strickland & Cole, Port Allen, for plaintiff, Robert J. Vandaworker, of Taylor, Porter, Brooks, Fuller & Phillips, Baton Rouge, for Travelers Ins. Co., Charles W. Wilson, of Watson, Blanche, Wilson, Posner & Thibaut, Baton Rouge, for Delta Tank Mfg. Co.
Before ELLIS, LOTTINGER, LANDRY, REID and BAILES, JJ.
ELLIS, Judge.
Plaintiff was injured in an accident while working in the course and scope of his employment with Delta Tank Manufacturing Company, Inc., on March 10, 1959, and suffered complete total and permanent disability for which he was being paid workmen's compensation by his employer, generally hereinafter referred to as "Delta".
On March 9, 1960, plaintiff filed suit in tort in the United States District Court, Eastern District of Louisiana, entitled "Herman Thibodeaux, plaintiff, vs. Parks Equipment Company and Humble Oil and Refining Company, defendants", which suit bore Civil Action No. 2308 on the docket of that court.
On August 31, 1960, plaintiff filed this suit naming as defendants Parks Equipment Company, and its alleged insurer, The Travelers Insurance Company, and Humble Oil and Refining Company.
On March 22, 1961, plaintiff filed a supplemental and amending petition naming as defendants for the first time Ashbury S. Parks and his alleged insurer, The Travelers Insurance Company, and Hartford Accident & Indemnity Company as the insurer of the executive officers, directors and stockholders of Delta.
In the supplemental and amending petition, the plaintiff alleged "the proximate cause of said accident was the joint and concurring negligence of defendants, Parks Equipment Company and Humble Oil and Refining Company and Mr. Ashbury S. Parks, and the executive officers, directors and stockholders of Delta Tank Manufacturing Company". In this supplemental petition plaintiff alleged that "The executive officers, directors and stockholders of Delta Tank Manufacturing Company, the names of all of whom are not known to plaintiff, but well known to defendant, and including particularly, but not exclusively, the following: Hal S. Phillips, W. V. Rathbone, Ross Baze, Jack Patton, and Glen Opel, were negligent in the following respects, all proximately causing the accident and the resulting injuries and damages: * * *". Plaintiff further alleged in this supplemental and amending petition that the proximate cause of the accident was the joint and concurring negligence of defendants, Parks Equipment Company and Humble Oil and Refining Company *235 and Ashbury S. Parks, and the executive officers, directors and stockholders of Delta Tank Manufacturing Company.
Humble Oil and Refining Company filed an answer to the plaintiff's original petition and a third party demand against Delta, Parks Equipment Company and The Travelers Insurance Company and thereafter amended its third party petition to include Ashbury S. Parks, Hartford Accident & Indemnity Company, as the insurer of the executive officers, directors and stockholders of Delta, and Delta in its corporate capacity. In its amending petition Humble Oil and Refining Company alleged on information and belief "that Hal S. Phillips, Bill Born, Don Jenkins, Jack Patton, Glen Opel, Otis Waguespack and Ross B. Bage are, and were at all times pertinent hereto, executive officers, directors and/or stockholders of Delta Tank Manufacturing Company."
Travelers filed exceptions of no cause of action to the petitions of plaintiff and the third party petition filed by Humble contending the policy thereby which had insured Parks Equipment Company excluded "products hazard" and failed to provide coverage in this suit. The trial court sustained these exceptions, thereby dismissing plaintiff's suit and the third party action against Travelers, from which judgments both plaintiff and third party petitioner (Humble) appealed. This court, composed of a three member panel, reversed the trial court. See Thibodeaux v. Parks Equipment Company, La.App., 140 So.2d 215. The organ of the court herein was a member of that panel and dissented from the majority, being of the opinion that the judgment of the lower court maintaining the exception of no cause of action was absolutely correct and should be affirmed. A rehearing was applied for by Travelers and denied by this court by two members of that panel with the writer herein again dissenting and Travelers applied to the Louisiana Supreme Court for a writ of certiorari which was duly denied by the Supreme Court on the grounds that the judgment of the Court of Appeal was not final. The Supreme Court then added:
"However, our refusal of this writ is not to be construed as an indication that we approve the result on the exception of no cause of action."
Parks Equipment Company answered the original and supplemental petitions, filed a third party demand against Delta Tank Manufacturing Company, Inc., Humble Oil and Refining Company, and Hartford Accident & Indemnity Company, as the insurer of the executive officers, directors and stockholders of Delta, alleging on information and belief that Hal S. Phillips, Bill Bourne, Don Jenkins, Jack Patton, Glen Opel, Otis Waguespack and Ross B. Baze are, and were at all times pertinent hereto, executive officers, directors and/or stockholders of Delta Tank Manufacturing Company. These are the same parties named as executive officers, directors and/or stockholders in the answer and third party petition of Humble.
Plaintiff filed a second supplemental petition naming as defendant Dover Corporation, as the alleged successor of Parks Equipment Company, and Dover filed an answer and third party claim against Parks Equipment Company, A. S. Parks, The Travelers Insurance Company, Delta Tank Manufacturing Company, Inc., Hartford Accident & Indemnity Company and Humble Oil and Refining Company.
All defendants, who are also third party plaintiffs, allege that the plaintiff was guilty of contributory negligence, if not in the specific language, substantially as Hartford alternatively charged plaintiff with contributory negligence as follows:
"19. In the alternative, and in the alternative only, should the Court find that an executive officer, director, or stockholder of Delta Tank Manufacturing Company was guilty of any negligence which was a proximate cause of the accident involved herein, which is emphatically denied, then and in that *236 event, and in that event only, this defendant pleads contributory negligence on the part of the plaintiff, which was a proximate cause of the accident, and bars recovery herein, which contributory negligence consisted particularly, but not exclusively, of the following:
1. In attempting to stop a leak by hammering on the valve while the unit was under high pressure which was a dangerous and hazardous undertaking, against all safety rules, all within the full and complete knowledge of the plaintiff.
2. In failing to follow the usual practice and safe practice, and failing to follow safety rules and regulations, by relieving the pressure in the unit prior to attempting to tighten any valves or bolts where a leak occurred.
3. In attempting to remedy the leak in the unit in a careless and reckless manner and failing to follow the usual customary and safe practice, all of which the plaintiff well knew and had complete knowledge of at the time of the accident.
4. In carelessly, negligently, and recklessly attempting to remedy a leak in the unit by hammering on the valve without releasing the pressure in the unit which resulted in the accident referred to in plaintiff's petition.
5. In failing to follow and conform to the usual and customary practice of releasing the pressure in the unit prior to attempting to correct a leak in the unit.
6. Plaintiff, being in full charge of the testing of the unit, and with the vast experience that plaintiff had had in connection with testing such units, and with full knowledge of the danger inherit in such operation, carelessly, negligently, and wantonly attempted to remedy a leak while the unit was under high pressure, and knew or should have known that to try to tighten the valve in question when it was under high pressure, with a hammer, was dangerous, risky, and contrary to all safety rules and practices."
All parties answered the numerous third party demands and the case was duly tried, which resulted in a voluminous record.
The District Court rendered judgment rejecting the demands of the plaintiff against all defendants and dismissed without prejudice and as non-suit all third party demands, except as to Hartford Accident & Indemnity Company. The judgment on the main demand against Hartford is as follows:
"This action came on to be tried before the Court, without a jury, pursuant to regular assignment on Monday, May 11, 1964. Present in Court: Wallace A. Hunter of Durrett, Hardin, Hunter, Dameron & Fritchie and T. C. Strickland of Strickland & Cole, counsel for plaintiff; R. Gordon Kean of Sanders, Miller, Downing, Rubin & Kean, counsel for Parks Equipment Company; Robert J. Vandaworker of Taylor, Porter, Brooks, Fuller & Phillips, counsel for The Travelers Insurance Company; E. L. Richardson of Dale, Richardson & Dale, counsel for Hartford Accident & Indemnity Company; M. Truman Woodward, Jr. of Milling, Saal, Saunders, Benson & Woodward, and Peter R. Monrose, Jr., attorneys for Humble Oil & Refining Company; Charles W. Lane, III of Jones, Walker, Waechter, Poitevent, Carrere & Denegre, attorneys for The Dover Corporation; Charles W. Wilson of Watson, Blanche, Wilson, Posner & Thibaut, attorneys for Delta Tank Manufacturing Company.
"The evidence was adduced by the parties and the Court after considering the evidence and pleadings being of the *237 opinion for oral reasons assigned on the issue of liability and for written reasons assigned on the issue of quantum, and being of the opinion for oral reasons assigned that a decision on the coverage afforded by The Travelers Insurance Company under its policy issued to Parks Equipment Company and by Hartford Accident and Indemnity Company to Delta Tank Manufacturing Company under its policy issued to Delta Tank Manufacturing Company was not necessary because of the Court's opinion on liability and therefore should be pretermitted.
"IT IS HEREBY ORDERED, ADJUDGED AND DECREED that:

"ON THE MAIN DEMAND
Plaintiff, Herman Thibodeaux, do have and recover Judgment in his favor and against Hartford Accident & Indemnity Company, a defendant, in its capacity as the public liability insurer of the executive officers of Delta Tank Manufacturing Company, in the full and true principal sum of One Hundred Fifty-five Thousand Three Hundred Fifty-four & 49/100 ($155,354.49) Dollars, plus interest thereon at the rate of 5% per annum from date of judicial demand until paid, together with all costs of Court.
"Defendants, Parks Equipment Company, The Travelers Insurance Company, Dover Corporation, and Humble Oil & Refining Company, do have Judgment in their favor and against plaintiff, Herman Thibodeaux, rejecting and denying the demands of plaintiff as to each and all of said defendants."
From the above judgments Hartford Accident & Indemnity Company obtained and perfected an order of suspensive, and in the alternative, a devolutive appeal. The plaintiff obtained and perfected a devolutive appeal "insofar as said judgment was in favor of defendants, Parks Equipment Company, The Travelers Insurance Company, Dover Corporation, and Humble Oil and Refining Company, rejecting the demands of plaintiff."
Parks Equipment Company, Humble Oil and Refining Company, The Dover Corporation, defendants, as well as third party plaintiffs, appealed devolutively from the judgment rejecting their demands as third party plaintiffs.
The Travelers Insurance Company, defendant insurer of Parks Equipment Company and as the insurer under the terms of its policy of Ashbury S. Parks, the President of Parks Equipment Company, under that portion of the policy defining insured as not only the named insured but also any "executive officer * * * while acting within the scope of his duties as such, * * *", has answered the appeal and requests that the trial court judgment be modified and revised so as to hold that The Travelers Insurance Company policy did not afford coverage for the accident sued upon and also that the action of the plaintiff as to The Travelers Insurance Company prescribed before this insurer was joined as a party to this suit. Counsel for Travelers in his brief advances the following argument in support of the contention that this court should reconsider the action of the former panel who considered this very same contention of no coverage in the case of Thibodeaux v. Parks Equipment Company, 140 So.2d 215:[1]
"It is entirely proper for Travelers to raise the question of coverage because of the way this case was decided by the Court of Appeal originally. In its opinion, as indicated above, the Court of Appeal remanded the case to the trial court for trial to give the plaintiff the opportunity to offer evidence in support of sub-paragraphs (d) through *238 (g). The clear implication of the original opinion of the Court of Appeal was that if the plaintiff failed to prove negligence under sub-paragraphs (d) through (g) that the Travelers policy would not afford coverage. Of course, the plaintiff did fail to prove negligence on the part of Parks Equipment Company under the above sub-paragraphs and, ipso facto, there is no coverage here on the part of Travelers even under the erroneous decision of the Court of Appeal.
"Then too, since the first decision of the Court of Appeal was not a final decision, the Court is at perfect liberty to again consider the coverage question and that is what we urge the Court to do."
This court has considered Travelers' request for reconsideration but we deny the same as we are of the opinion that this court is now bound by the majority opinion in the cited case and it can only be changed by the Supreme Court should the case reach that court.
We will not consider the plea of prescription in view of the conclusions that we have reached on the merits in this case.
In the supplemental petition previously referred to, filed on March 22, 1961, Article 9A, the plaintiff made defendants:
"Executive officers, directors, and stockholders of Delta Tank Manufacturing Company, the names of all of whom are not known to plaintiff, but well known to defendant, and including particularly, but not exclusively, the following: Hal S. Phillips, W. V. Rathbone, Ross Baze, Jack Patton, and Glen Opel, and allege that they were negligent in the following respects, all proximately causing the accident and resulting injuries and damages:
(a) The executive officers, directors, and stockholders, of Delta Tank Manufacturing Company were negligent in the preparation of the plans, specifications and design of the said Dryex unit, plaintiff alleging on information and belief that the said plans, specifications and design of the said unit were prepared by some of the executive officers set forth above, in cooperation with representatives of Humble Oil & Refining Company, and Parks Equipment Company and Mr. A. S. Parks;
(b) Certain executive officers, directors, and stockholders of Delta Tank Manufacturing Company were negligent in approving the plans, specifications and design of the said Dryex unit using a `union fitting' or valve fitting to connect the six inch high pressure pipe sections utilized in the said Dryex unit;
(c) Certain executive officers, directors, and stockholders of Delta Tank Manufacturing Company were negligent in either designing and/or approving the plans, specifications and design of the said Dryex unit using a `union fitting' or valve to connect the six inch high pressure pipe utilized in the said unit when they knew or should have known of the high pressure to which the said unit would be subjected;
(d) Certain executive officers, directors, and stockholders of Delta Tank Manufacturing Company were negligent in the inspection and supervision of the said Dryex unit prior to and at the time of testing in that they failed to determine that the said `union fitting' or valve was not suitable for use in said unit under the conditions prevailing;
(e) Certain executive officers, directors, and stockholders of Delta Tank Manufacturing Company *239 were negligent in the design of the Dryex unit in authorizing a `union fitting' or valve in said unit rather than `bolted flanges' when they knew of the extreme high pressure to which said unit would be subjected;
(f) Certain executive officers, directors, and stockholders of Delta Tank Manufacturing Company were negligent in authorizing the testing and construction of the Tryex unit using a valve which had been designed for use with `O-rings' without the said `O-rings' and with a gasket, when the use of a gasket with a valve manufactured and designed to be used with `O-rings' reduced the threat protection for the fitting;
(g) Certain executive officers, stockholders, and directors of Delta Tank Manufacturing Company were negligent in using a gasket with the valve assembly when the valve was designed to be used with an `O-ring' and they knew or should have known that in such an event there would not be sufficient threat protection for the unit to withstand pressure of 1500 pounds per square inch to which it would be subjected.
(h) The executive officers, directors, and stockholders of Delta Tank Manufacturing Company were further guilty of negligence in connection with the preparation and planning of the Dryex unit, the inspection of the said Dryex unit prior to testing, and in the manner of testing of the said unit, and in the assembly of said unit."
Plaintiff also made defendant in the above referred to supplemental and amending petition Hartford Accident & Indemnity Company as the insurer of the executive officers, directors and stockholders of Delta, which was provided under the insurance coverage afforded Delta by Hartford, as shown in the policy introduced in evidence. The named insured is Delta Tank Manufacturing Company, Inc., and under the definition of "Insured" coverage is extended to include:
"* * * named insured and also includes (1) under coverages B and D, any executive officer, director or stockholder thereof while acting within the scope of his duties as such, * * *".
This policy afforded no coverage to an employee of Delta unless he could be held to be an executive officer, director or stockholder thereof and, secondly, such executive officer, director or stockholder of Delta must have been shown to have been acting within the scope of his duties as such in order to be considered a named insured under the provision.
Hartford Accident & Indemnity Company has also filed in this court a plea of prescription of one year under Articles 3536 and 3537 of the Civil Code.
Counsel for Hartford in his brief on argument of the plea of prescription states, "all facts constituting the basis of Hartford's plea of prescription under Articles 3536 and 3537 of the Civil Code of Louisiana are in this record now before the court." and "that the plea of prescription should be sustained and plaintiff's suit dismissed at his cost (LSA-C.C.P.Article 2163; Franks v. City of Alexandria, [La.App.] 128 So.2d 310; Merchants Adjustment Bureau and [v.] Malta [La.App.] 102 So.2d 781; Crain v. Graves, [La.App.] 152 So.2d 104; City of New Orleans v. D. [Di] Beneditto, [La.App.] 144 So.2d 558)".
Under the law in considering this plea of prescription this court will have to consider the entire evidence touching upon this question offered in evidence which will be unnecessary under the conclusion on the merits that we have reached in this case. We therefore pretermit any consideration of the plea of prescription.
*240 In addition to the supplemental and amending petition which plaintiff filed on March 22, 1961, naming Hartford as a defendant in the case and setting forth a claim against it as insurer of the executive officers, directors and stockholders of Delta and naming specifically persons coming within this category, there was also filed by Parks Equipment Company a third party demand against Hartford in which it named as executive officers of Delta Hal S. Phillips, W. V. Rathbone, Ross Baze, William Bourne, Don Jenkins, Jack Patton, Glen Opel and Otis Waguespack.
Thereafter, Hartford filed two motions for summary judgment, one against the plaintiff and one against Parks, for the purpose of having the District Court decree that only Hal S. Phillips, President, and W. V. Rathbone and Ross Baze, Vice Presidents of Delta, were executive officers within the meaning of Hartford's coverage. Affidavits were executed by Phillips, President of the corporation, and Joe E. Ketner, Vice President and member of the Board of Directors, showing all the persons named in the pleadings mentioned above were employees of Delta, and had nothing whatever to do for the corporation in executive capacities or were directors or stockholders except Hal S. Phillips, W. V. Rathbone and Ross Baze.
The court granted the motion of summary judgment as to all employees except Don F. Jenkins and Jack Patton.
In its written reasons sustaining the two motions for summary judgment except as to Don F. Jenkins and Jack Patton, the court said:
"This matter is before the court on two motions for summary judgment filed by Hartford Accident and Indemnity Company, one of the defendants. Hartford was admittedly the general liability insurer of Delta Tank Manufacturing Company, Inc., a third party defendant herein, on the date of the accident forming the basis for this suit. The policy in question provides that in addition to the named insured, Delta, coverage is extended to
any executive officer, director or stockholder thereof while acting within the scope of his duties as such
In the first of the two motions for summary judgment Hartford seeks the dismissal of the claims of plaintiff insofar as his petition and supplemental petition allege that it provided insurance coverage for Jack Patton and Glen Opel, who are alleged to have been executive officers of Delta.
The second motion is leveled at the third party demands of Parks Equipment Company, a defendant herein, and seeks the dismissal of Parks's claims insofar as its third party petition alleges that Hartford provided insurance coverage for William Bourne (erroneously referred to as Bill Born), Don Jenkins, Jack Patton, Glen Opel, and Otis Waguespack, alleged to have been executive officers of Delta.
It is not contended that any one of the above named persons alleged to have been executive officers of Delta was either a director or stockholder of Delta.
Filed with the first motion is the affidavit of the president of Delta that Patton and Opel were nothing more than engineering employees of the corporation, without any authority or duty in the formation or direction of the corporation's policies.
A similar affidavit of Delta's president is filed with the second motion, setting forth the employment status of Bourne, Jenkins, and Waguespack, and averring the same absence of authority or duty on their part as in the case of Patton and Opel. There is also filed with the second motion the affidavit of Delta's vice-president to the same effect as the president's affidavit, and with reference to all five of the named employees.

*241 The countervailing offering made here by plaintiff and third party plaintiff, Parks Equipment Company, consists of the deposition of Don F. Jenkins. His testimony creates a dispute as to the employment status of himself and that of Jack Patton, thereby, in my opinion, raising a genuine issue as to material fact, and hence Hartford is not entitled to the summary judgments prayed for as to these two employees.
As to the other three employees, Bourne, Opel, and Waguespack, nothing has been offered by either plaintiff or third party plaintiff in opposition to the affidavit offered by Hartford, and the motions for summary judgments are granted as to these three employees."
The District Judge gave no detailed written reasons but unquestionably rendered judgment against Hartford under the extended provision of its policy, supra, for negligence of one or all of its executive officers, directors or stockholders of Delta "while acting within the scope of his duties as such * * *". It is admitted that Hal S. Phillips, President, W. V. Rathbone and Ross Baze, both Vice Presidents of Delta, were all executive officers within the meaning of Hartford's coverage. The court, ruling on the motion for summary judgment by Hartford, held that there was a genuine issue as to material fact, namely, whether Patton and Don Jenkins were executive officers. The court on the merits did not in its judgment designate whether it included them specifically as being executive officers for it rendered judgment in favor of the plaintiff and "* * * against Hartford Accident and Indemnity Company, a defendant, in its capacity as the public liability insurer of the executive officers of Delta Tank Manufacturing Company, * * *". We therefore feel that it is necessary for this court to determine whether Patton and Jenkins were executive officers and covered under the extended terms of Hartford's policy. Neither was a director or stockholder of Delta Tank Manufacturing Company, Inc. The District Court based its ruling in refusing the summary judgment of Hartford as to Patton and Jenkins upon the testimony of Don F. Jenkins, given in deposition and filed in evidence as Exhibit P-1 on the motions for summary judgment on page 50, wherein he testified under questioning by Mr. Hunter, counsel for plaintiff, that:
"Q. In other words, when you refer then to management, you are referring to all personnel in a supervisory capacity, is that right, sir?
A. Supervisory or shall I say salaried employed personnel.
Q. In other words, those that are on a monthly salary as compared to those that work by the hour, is that right?
A. Yes, sir.
Q. And you at that time then were a salaried employee, is that right, sir?
A. Yes, sir."
This witness testified also that Jack Patton was chief engineer in charge of the Oil Field Division of Delta. The record further shows that the sole duties of Patton were in an engineering capacity and that he had nothing whatever to do with general or over-all management of the company nor in shaping the policies of the company and neither was he a stockholder or a director (R 642). Jenkins on the date of the accident, and prior thereto, was the shop foreman whose sole duty with the corporation was foreman of one of the bays in the manufacturing plant and neither did he have anything to do with the over-all or general operation of the company nor with the shaping or formation of the policies of the company (R 639, 642). Both were employees whose managerial duties were limited to their respective departments.
We believe that the judgment of the District Court on the summary motion in which he held that Bourne, Opel and *242 Waguespack, were not covered under the extended coverage provision, supra, as they were neither executive officers, directors or stockholders, was eminently correct.
The question of who and what is an executive officer is not new to our law. Counsel for Hartford has referred this court to the cases of Bruce v. Travelers Insurance Company, 5 Cir., 266 F.2d 781, and Employers' Liability Assurance Corp. Ltd. v. Upham, 150 So.2d 595, which was decided by the Fourth Circuit Court of Appeal of the State of Louisiana.
We are in full accord with the brief filed on behalf of Hartford on this question and quote with approval therefrom:
"As the charter and by-laws did in the Bruce case, supra, the charter and by-laws of Delta specifically set forth the `officer positions' of the corporation (R. 582, 567, 568 and pages 12 and 13 of this brief).
"The Bruce case, supra, cited with approval by the Louisiana Court of Appeal in the Upham case, supra, is so decisive of the issues involved herein relating to the meaning of the language `executive officers', for the convenience of the Court, we are taking the liberty of quoting a portion of the Court's opinion:
"`(1) There are two aspects to the question at issue on this appeal: (1) What is an "executive officer", as that term is used in a public liability insurance policy covering a large oil company and its executive officers? (2) Is the question a matter for the Court to decide on a motion for summary judgment or for a jury to decide after a trial?
"`Jack Bruce, plaintiff-appellant, was employed as a roughneck by the Gulf Drilling and Well Service. Bruce's employer, was engaged in reworking an oil well for Gulf Refining Co. (Gulf), a company unrelated to Bruce's employer, when Bruce was injured as the result of negligence on the part of a Gulf employee, H. J. Collins.
"`(2) It is conceded that Bruce is entitled to recover from Gulf under the Louisiana Workmen's Compensation Law. LSA-R.S. 23:1061. As the employee of an independent contractor, he is barred from recovering damages from Gulf in tort. Travelers Insurance Company carries a public liability insurance policy on Gulf that also provides extended coverage for "any executive officer, director or stockholder * * * while acting within the scope of his duties". Bruce brought suit for personal injuries against Travelers, under the Louisiana Direct Action Statute, as the insurer of Collins. LSA-R.S. 22:655. The theory of the complaint is that Collins was an executive officer of Gulf, since he was "invested with the general conduct and control of the business of Gulf Refining" at the well location afwykin
"`Travelers filed a motion for a summary judgment and introduced affidavits, depositions, and Gulf's charter and by-laws to show that Collins was not an executive officer of Gulf. The plaintiff offered no counter-affidavits or depositions, taking the position that he was entitled to have the jury determine whether Collins was an executive officer.
"`The trial judge found that the Gulf area superintendent assigned Collins to work as a drilling foreman (a "tool pusher" or "ramrod", in the jargon of the oil industry), and that Collins was at all times under the supervision of the area superintendent. Collins' job, the trial judge stated consisted "primarily in seeing that the contractor performed his duties, as outlined in the contract, to insure that the equipment furnished on location by Gulf Refining Company was not misused or damaged, and to see that the contractor exercised all necessary precautions to control the well". Collins was never elected or chosen by the Board of Directors of Gulf as an officer with any *243 term of office, powers or duties, or salary fixed by the Board. On these findings the trial judge held:
"We reach the inescapable conclusion that Collins was not an executive officer. If a jury were to hold otherwise I would, under the law, feel it my duty to set the verdict aside, because there is no issue of fact to be submitted to a jury on the decisive issue of coverage."
"`The court granted the motion for a summary judgment and dismissed the complaint. We affirm.
"`Paragraph 26 of Gulf's by-laws specifically names the officers of Gulf and provides that the officers must be elected by the board of directors. It reads:
"The officers of the corporation shall be chosen by the directors and shall be a chairman of the board, a president, one or more vice-presidents, a secretary, a treasurer, a comptroller and a general counsel. The board of directors may also choose one or more assistant secretaries, assistant treasurers and assistant comptrollers. Two or more offices may be held by the same person, except that where the offices of president and secretary are held by the same person, such person shall not hold any other office."
"`Paragraph 28 provides that the Board of Directors may appoint such "other officers" as it shall deem necessary. They hold office for such terms and exercise such powers as the Board determines. Paragraph 32 of the by-laws provides that the president of the corporation shall be the "chief executive officer" of the corporation.
"`This language is free from ambiguity. The intention of these provisions of the by-laws is clearly to allow the corporation to determine for itself what persons shall be officers and how they shall be chosen. In this case such intention does not conflict with any statute nor does the denomination of certain persons as officers cut across any statutory use of the term "officers" having a broad frame of reference.
"`No court in this part of the world can ignore the common knowledge that a large oil company having thousands of employees and representatives has hundreds of employees and representatives in positions of great responsibility. But tool pushers, ramrods, supervisors, drilling superintendents, area superintendents, or other employees having responsible duties are not officers, under the unambiguous by-laws of Gulf Refining Company. Nor can it be said a tool pusher or a ramrod or a supervisor at a well location functions in an executive capacity, as "executive officer" is understood in the ordinary acceptance of the term. The term implies some sort of managerial responsibility for the affairs of the corporation generally and it imports a close connection with the board of directors and high officers of the company. Insurance policies should be construed liberally, but the words of a policy must be given the meaning they ordinarily bear. "No strained or unusual construction should be given to any of the terms of a policy of insurance, in favor of the insurer or of the insured". Empire Life Insurance Co. v. Gee, 1912, 178 Ala. 492, 60 So. 90, 92. Or, we add, in favor of a third party claimant.

"`The distinction between an agent or employee and an officer is not determined by the nature of the work performed, but by the nature of the relationship of the particular individual to the corporation. The principle is well stated in 13 American Jurisprudence, par. 866, p. 854:
"The relationship of a person to a corporation, whether as officer or as agent or employee, is not determined by the nature of the services performed, but by the incidents of the relationship as they actually exist. * * * One distinction between officers and agents *244 or employees of a corporation lies in the manner of their creation. An office is created usually by the charter or by-laws of the corporation, while an agency or employment is created usually by the officers. A further distinction may thus be drawn between an officer and an employee of a private corporation in that the latter is subordinate to the officers and under their control and direction."

"`Many cases have applied this principle. Thus, in Vardeman v. Penn Mutual Life Ins. Co., 1906, 125 Ga. 117, 54 S.E. 66, 67 the court held: "One distinction between officers and agents of a corporation lies in the manner of their creation. An officer is created by the charter of the corporation, and the officer is elected by the directors or the stockholders. An agency is usually created by the officers, or one or more of them, and the agent is appointed by the same authority. It is clear that the two terms officers and agents are by no means interchangeable." In Cosgriff v. Duluth Firemen's Relief Ass'n, 1951, 233 Minn. 233, 46 N.W.2d 250, the court held that even a trustee of a firemen's relief association was not an executive officer. Rosenblum v. N. Y. Central R. R. Co., 1948, 162 Pa.Super. 276, 57 A.2d 690, 691 was a suit for specific performance to compel the New York Central to transfer land on a contract signed by a land agent for the railroad. Written authority was required for contracts in the name of the corporation, except contracts signed by executive officers. The Court held that the land agent was not an executive officer and pointed out that "the executive officers of a corporation are officers of the entity, and not officials merely of the business conducted by the corporation."
"`The cases to the contrary are cases in which public policy has impelled courts to give a broad interpretation to a state workmen's compensation act or to some other statute charging a corporation with liability for the acts of its officers. The California and Arkansas compensation laws, in the cases cited by appellant, use the term "executive or managing officer". In Horst Co. v. Industrial Accident Commission of California, 1920, 184 Cal. 180, 193 P. 105, 109, 16 A.L.R. 611, however, the California court observed that the terms "executive officer" and "managing officer" are not synonymous; that an "executive officer" is elected in accordance with the charter or by-laws; that the statute initially used the term "executive officers" but was amended by adding "managing officer," and has not specified that the officer shall be an elective one * * * (so that it is) clear * * * that the legislature by this section did not use "officer" in its technical legal sense.
"`The way in which the complaint is framedBruce against Gulf's insured tends to obscure the decisive fact that Bruce's claim is against Collins, not against Gulf. The case, therefore, does not depend on the liability of the corporation for the acts of officers nor does it turn on disputed facts as to an officer's delegated authority and whether certain acts were within the scope of the officer's authority. The decision depends on a correct reading of the intention of Gulf and Travelers as they expressed their intention in their insurance agreement, a matter peculiarly within the province of a court. Gulf and Travelers agreed that the extended coverage would apply to executive officers. The best place to look for evidence of that intention is in Gulf's charter and by-laws defining and denominating officers. Appellant concedes that Collins was not an "executive officer", as that term is defined and denominated in the charter and by-laws. Appellant has not offered to prove that the parties intended another meaning. His argument, in effect, is that other persons, members of a jury, might understand "executive Officer differentlyby attaching controlling importance to the fact (undisputed) *245 that Collins had some supervisory duties at the well where the plaintiff was injured. That argument by-passes the intention of the parties and attempts to shift the judicial function from the court to the jury.' (Emphasis added)
"In the Upham case, supra, the court sustained a motion for summary judgment decreeing George Shane was not an `executive officer' within the meaning of that term used in a public liability policy issued to `Upham Engineering Company, John D. Upham, Prop.,' and in the course of the opinion said: "`Plaintiff strenuously contends that George Shane is an executive officer of Upham Engineering Company and that issue is the focal point in the case.
"`From the depositions and affidavits in the record, we ascertain that Upham Engineering Company is engaged in a general construction business and George Shane was one of the employees, hired as a carpenter foreman, and was under direction of John D. Upham and one Hoppmeyer, General Superintendent. Shane was a member of the local carpenter's union and received the hourly rate of pay for foremen established by the union. When asked if Shane was a "key" man and "necessary", John D. Upham stated:
"Necessary, just as much as the men, the laborers that dig a ditch, you've got to have them there, not key, as far as running in the overall picture of your business. They're assigned to one job and work on that job, they are key as far as that job is concerned."
"`Shane has been an employee of Upham for about three years. When asked if Upham would refer to him as a superintendent, Shane's reply was:
"He introduces you as his superintendent of the job, but we are actually foreman. When I came to him I was hired as foreman."
"`Shane admitted there were other persons employed by Upham Engineering Company in the same capacity as he.
"`The construction of the Bridgedale Baptist Church was discussed, and the evidence shows Shane's duties and responsibilities consisted primarily of laying out the work, assigning the men, and performing some general acts of supervision in connection with the job. He stated that the contract for the Bridgedale Baptist Church job contained an outlined procedure insofar as the written plans and specifications were concerned and that he had no authority either to alter any contract terms or conditions or to change or alter the specified plan of procedure. He reported any unusual or emergent development relative to necessary changes to his supervisor, Hoppmeyer. He further said that Hoppmeyer was the "top man" and was next to Upham in the chain of command. Shane would receive orders either from Upham or Hoppmeyer and "would relay the orders to the other men." If a project happened to be a small one, Shane would join the other employees and work as a carpenter. At the time the accident happened four carpenters and from eight to ten men where in the employ of Upham's organization and if additional laborers were needed, Shane would contact Hoppmeyer who supplied them. He denied that he was president, vice-president, secretary or treasurer, and when asked whether he was a member of the Board of Directors, Shane replied: "No, sir; just a plain foreman."
"`None of the above facts are in dispute and these, we think, clearly demonstrate that Shane's connection with Upham Engineering Company was not that of an "executive officer" as we understand the term. He had no managerial authority nor anything to do with the operation of his employer's business, save in the capacity of workmana carpenter-foreman. We agree with what the United States *246 Court of Appeals, Fifth Circuit, said in Bruce v. Travelers Insurance Company, 266 F.2d 781:
"* * * Nor can it be said a tool pusher or a ramrod or a supervisor at a (oil) well location functions in an executive capacity, as `executive officer' is understood in the ordinary acceptance of the term. The term implies some sort of managerial responsibility for the affairs of the corporation generally and it imports a close connection with the board of directors and high officers of the company. * *"
"The distinction between an agent or employee and an officer is not determined by the nature of the work performed, but by the nature of the relationship of the particular individual to the corporation. * * *"
"`We think the exception was correctly maintained and that the motion for summary judgment was properly allowed.' (Emphasis added)"
We are of the opinion that, applying the principles and tests enunciated in the quotation to the proven facts in this case as to the nature of employment and duties performed by Patton and Jenkins, they could not be classified as executive officers and we so hold. Also, the articles of incorporation of Delta, covering "officers" of the corporation are set forth in counsel's brief and for the sake of brevity as well as time we quote same as follows:
"Delta Tank Manufacturing Company, Inc., was a corporation organized under the laws of Louisiana (R. 571-588). Its charter was originally filed with the Secretary of State on January 30, 1946 (R. 571). Its original charter and amendments thereto appear in the record at pages 571 to 588.
"Article IX of the original charter provided for three directors (R. 575) and Article X provided for the officers of the corporation in the following language (R. 576):

"ARTICLE X
"`The following are declared to be the first officers of the corporation, each to serve until his or her successor has been elected by the Board of Directors and has entered into the discharge of the duties of such office, subject to removal at any time by the Board of Directors:
Hal S. Phillips, President
Homer E. Kirkpatrick, Vice President
Rawlston D. Phillips, Secretary-Treasurer' (Emphasis added)
"Article IX of the charter was amended to increase the number of directors from three to seven (R. 581) and Article X was amended to create the officer of `Chairman of the Board of Directors' in the following language (R. 582):

"ARTICLE X
"`The following are declared to be the officer positions of the Corporation, each to serve until his or her successor has been elected by the Board of Directors after having entered into the discharge of the duties of such officer subject to removal at any time by the Board of Directors.
Chairman of the Board of Directors
President
Vice President
Treasurer
Secretary
"`The number of Vice Presidents and their designation shall be in accordance with the By-Laws of the Corporation and one person may be elected to more than one office at the discretion of the Board of Directors.' (Emphasis added)
*247 "The By-Laws of Delta appear in the record at pages 567 to 569. Articles II and IV provide as follows (R. 567, 568):

"ARTICLE 2BOARD OF DIRECTORS
"`Section 1. The management and control of the business of the Corporation shall be vested in a Board of Directors, consisting of not more than seven (7) members, who shall be elected by the stockholders, for a term of one year, and who shall hold office until their Successors are elected and qualify. The Board of Directors may employ such agents as it deems advisable.
Section 2. Any vacancies in the Board of Directors caused by resignation, death, or otherwise may, except as may be otherwise provided in the Certificate of Incorporation, be filled by the remaining directors, at a special meeting called for that purpose, or by the stockholders at any regular or special meeting held prior to the filling of such vacancy by the Board as above provided. The person so chosen as director shall hold office until the next annual meeting of stockholders, or until his successor is elected and qualifies.'

"ARTICLE 4OFFICERS
"`Section 1. The officers of the Corporation shall consist of a Chairman of the Board, a President, a Vice-President, a Secretary and a Treasurer, who shall be elected for one year by the Board of Directors at its first meeting after the annual meeting of stockholders, and who shall hold office until their successors are elected and qualify. The office of Secretary and Treasurer may be held by the same person. Any vacancies in office arising from death, resignation or otherwise may be filled by the Board of Directors at any regular or special meeting. The duties of the officers shall be such as are usually imposed upon such officials of corporations and as are required by law, and such as may be assigned to them, respectively, by the Board of Directors from time to time.'

"ARTICLE 5AMENDMENT OF BY-LAWS
"`Section 1. These By-Laws may be amended or repealed, or new By-Laws may be made and adopted, at any annual or special meeting of stockholders called for that purpose, by the vote or written assent of the holders representing two-thirds (2/3rds) of the subscribed capital stock, or by a vote of two-thirds (2/3rds) of the Board of Directors at a regular or special meeting of the Board.'"
Applying the law enunciated in the cases cited, supra, to the facts in this case, it is clear that neither Jenkins nor Patton held a position or office created by the corporate charter, nor did they have authority, discretion and managerial responsibility of a general nature covering the divergent affairs of Delta. Neither were they elected by the board of officers of the stockholders. Neither had any duties or authority outside of his department. They were strictly employees and cannot be classified as executive officers.
We therefore find that of all the persons named in the pleadings only Hal S. Phillips, President, W. V. Rathbone and Ross Baze, Vice-Presidents of Delta, were executive officers or were directors or stockholders. It therefore follows that the liability of Hartford under its policy is dependent upon proof in this record of the negligence of one or more of the three named persons found to be executive officers, "while acting within the scope of his duties as such" which contributed to or was the proximate cause of the accident in which plaintiff was so severely injured.
*248 Plaintiff alleged that the executive officers, directors and stockholders of Delta Tank Manufacturing Company, Inc., `who would be limited under the pleadings and proof to Phillips, Rathbone and Baze, were negligent in the following respects:
"(a) The executive officers, directors, and stockholders, of Delta Tank Manufacturing Company were negligent in the preparation of the plans, specifications and design of the said Dryex unit, plaintiff alleging on information and belief that the said plans, specifications and design of the said unit were prepared by some of the executive officers set forth above, in cooperation with representatives of Humble Oil & Refining Company, and Parks Equipment Company and Mr. A. S. Parks;
(b) Certain executive officers, directors, and stockholders of Delta Tank Manufacturing Company were negligent in approving the plans, specifications and design of the said Dryex unit using a `union fitting' or valve fitting to connect the six inch high pressure pipe sections utilized in the said Dryex unit;
(c) Certain executive officers, directors, and stockholders of Delta Tank Manufacturing Company were negligent in either designing and/or approving the plans, specifications and design of the said Dryex unit using a `union fitting' or valve to connect the six inch high pressure pipe utilized in the said unit when they knew or should have known of the high pressure to which the said unit would be subjected;
(d) Certain executive officers, directors, and stockholders of Delta Tank Manufacturing Company were negligent in the inspection and supervision of the said Dryex unit prior to and at the time of testing in that they failed to determine that the said `union fitting' or valve was not suitable for use in said unit under the conditions prevailing;
(e) Certain executive officers, directors, and stockholders of Delta Tank Manufacturing Company were negligent in the design of the Dryex unit in authorizing a `union fitting' or valve in said unit rather than `bolted flanges' when they knew of the extreme high pressure to which said unit would be subjected;
(f) Certain executive officers, directors, and stockholders of Delta Tank Manufacturing Company were negligent in authorizing the testing and construction of the Dryex unit using a valve which had been designed for use with `O-rings' without the said `O-rings' and with a gasket, when the use of a gasket with a valve manufactured and designed to be used with `O-rings' reduced the threat protection for the fitting;
(g) Certain executive officers, stockholders, and directors of Delta Tank Manufacturing Company were negligent in using a gasket with the valve assembly when the valve was designed to be used with an `O-ring' and they knew or should have known that in such an event there would not be sufficient threat protection for the unit to withstand pressure of 1500 pounds per square inch to which it would be subjected.
(h) The executive officers, directors, and stockholders of Delta Tank Manufacturing Company were further guilty of negligence in connection with the preparation and planning of the Dryex unit, the inspection of the said Dryex unit prior to testing, and in the manner of testing of the said unit, and in the assembly of said unit." *249 Plaintiff joined Travelers as the insurer of Ashbury S. Parks, "acting as an executive officer of Parks Equipment Company," who was the President, also a director and stockholder, as being negligent in the following respects:
"(a) Ashbury S. Parks knew or should have known that Delta Tank Manufacturing Company had in stock valves manufactured by Parks Equipment Company which were to be used as a component part of the Dryex unit being assembled by Delta Tank Manufacturing Company, which said valves were designed for use with `O-rings' and that it had been decided by Delta Tank Manufacturing Company and Parks Equipment Company and Mr. Ashbury S. Parks, and others, that the valves designed for use with `Orings' were to no longer be used in said assembly but instead gaskets were to be used in lieu of `O-rings' and that Delta Tank Manufacturing Company planned to use gaskets but he nonetheless failed to warn, advise, and notify Delta Tank Manufacturing Company of the fact that a different valve would have to be used if a gasket was to be part of the valve assembly rather than `O-rings' because as a result of the change in the valve when assembled there would not be sufficient thread protection for the unit to withstand pressure to which it was to be subjected;
(b) Ashbury S. Parks failed to warn representatives of Delta Tank Manufacturing Company and Humble Oil & Refining Company of the necessity for discarding all previous valves in stock which had been designed for use with `O-rings' when used with gaskets;
(c) Ashbury S. Parks knew or should have known that Delta Tank Manufacturing Company would use the valves in stock designed for use with `O-rings' with gaskets rather than the `O-rings' and he failed to take any action whatsoever to prevent the use of the valves designed to be used with `O-rings' from being used with gaskets and in fact affirmatively informed and advised representatives of Delta Tank Manufacturing Company that the valves in stock could be used with a gasket rather than `O-rings';
(d) Ashbury S. Parks failed to realize prior to the accident involved herein, that it would be necessary to completely redesign the valves manufactured to be used with `O-rings' if said valves were used with gaskets because until the accident occurred he failed to realize that as a result of the change there was eliminated a large portion of the thread protection of the nut to be used to connect the pipe assembly to the valve;
(e) Ashbury S. Parks was in Baton Rouge, Louisiana, on the date of the accident conferring with representatives of Delta Tank Manufacturing Company, and he knew that the said unit was being subjected to testing on the date in question and that a valve design for use with an `O-ring' was being used with a `gasket' and he knew or should have known that the said valve would have insufficient thread protection when used in such a manner, but he nonetheless failed to warn representatives of Delta Tank Manufacturing Company not to carry out the testing because of the danger involved;
(f) Ashbury S. Parks knew or should have known that the valve commonly referred to as a `three-way hot valve' had proved unsatisfactory in the field when used with an `O-ring' assembly and he had instructed representatives of Delta Tank Manufacturing Company to use said valves with gaskets in lieu of `O-rings' and he knew or should have known that Delta was using said *250 valves with gaskets as part of the assembly and not only did he misrepresent to representatives of Delta the fact that the valve could be used with gaskets in lieu of `O-rings' but he also failed to warn Delta that this change would result in inadequate thread makeup;
(g) Ashbury S. Parks as an executive officer of Parks Equipment Company was further guilty of negligence and carelessness, in both acts of omission and commission, which proximately caused and contributed to said accident."
Counsel for the plaintiff and defendants cite the case decided by this court of Adams v. Fidelity & Casualty Co. of New York, La.App., 107 So.2d 496, which involved the question of liability of executive officers, directors and stockholders of a corporation, and an additional coverage under that policy of employees to an employee of the corporation, with which we are not here concerned as the only coverage in the case at bar is to the executive officers, directors and stockholders of the corporation. The Adams case was before this court upon an exception of no cause of action which had been sustained by the District Court. Of course, the allegations of the petition were accepted as true, whereas in the present case the preponderance of the evidence must sustain the charge of negligence made by plaintiff against each defendant as the proximate cause of the accident and injury to the plaintiff before judgment could be rendered against such defendant and in favor of the plaintiff herein. It is one thing to allege a cause of action and another to prove it. The former is easy for the purpose of stating a cause of action as the allegation must be accepted as true whereas in the latter case, on the merits, the former must be proved by a preponderous of evidence. We do not find where the Adams case, if it was ever tried, went beyond the District Court, as no appeal on the merits ever came to this court.
Plaintiff's suit against Parks Equipment Company is based upon the following allegations:

"8.
"Plaintiff alleges that the officers, agents, and employees of Parks Equipment Company were negligent in the following respects, all of which proximately caused said accident and resulting injuries:
"(a) The officers, agents and employees of Parks Equipment Company were negligent in the operation of their machine shop in that in the manufacture and processing of said `union fitting' or valve the threads of the union were improperly constructed;
(b) The officers, agents and employees of Parks Equipment Company were negligent in the operation of their machine shop in the inspection of the union fitting or valve and in failing to determine that it had been defectively constructed when such defects should have been detected by inspectors in said machine shop;
(c) The officers, agents and employees of Parks Equipment Company were negligent in the design of the `union fitting' or valve;
(d) The officers, agents and employees of Parks Equipment Company were negligent in representing to representatives of Delta Tank Manufacturing Company that said union fitting or valve could properly be used as a component part of the said dryex unit when they knew or should have known of the pressure to which the dryex unit would be subjected;
(e) The officers, agents and employees of Parks Equipment Company were negligent in the operation of their business in that they failed to warn representatives of Delta Tank Manufacturing *251 Company that said `union fitting' or valve could not safely be used in the dryex unit when they knew of the pressure to which the unit would be subjected;
(f) The officers, agents and employees of Parks Equipment Company were further guilty of negligence in the design, manufacture, construction and inspection of the `union fitting' or valve and in failing to give proper instructions for its use;
(g) The officers, agents and employees of Parks Equipment Company were further negligent in their representations as to the use to which said `union fitting' or valve could be put in connection with the over all dryex unit being manufactured by Delta Tank Manufacturing Company and in their failure to warn the manufacturers of the dryex unit, when they had full knowledge of the plans, specifications and design of the said unit, of the fact that a `union fitting' or valve could not safely be used in said unit, and in failing to give proper instructions for its installation in the unit."
Plaintiff's allegations of negligence and the basis of its suit against Humble Oil and Refining Company are as follows:

"9.
"The officers, agents and employees of defendant, Humble Oil & Refining Company were negligent in the following respects, all proximately causing the accident and resulting injuries and damages;
(a) The officers, agents, and employees of Humble Oil & Refining Company were negligent in the preparation of the plans, specifications and design of the said dryex unit, plaintiff alleging on information and belief that the said plans, specifications and design of the said unit were prepared either by or in cooperation with others by the officers, agents, and employees of Humble Oil & Refining Company;
(b) The officers, agents and employees of Humble Oil & Refining Company were negligent in approving the plans, specifications and design of the said dryex unit using a `union fitting' to connect the six inch high pressure pipe sections utilized in said dryex unit;
(c) The officers, agents and employees of Humble Oil & Refining Company were negligent in either designing and/or approving the plans, specifications and design of the said dryex unit using a `union fitting' or valve to connect the six inch high pressure pipe utilized in said unit when they knew or should have known of the full pressure to which said unit would be subjected;
(d) The officers, agents and employees of Humble Oil & Refining Company were negligent in the inspection and supervision of the said dryex unit prior to and at the time of testing in that they failed to determine that said `union fitting' or valve was not suitable for use in said unit under the conditions prevailing;
(e) The officers, agents and employees of Humble Oil & Refining Company were negligent in the design of the dryex unit in authorizing a `union fitting' in said unit rather than `bolted flanges' when they knew of the extreme high pressure to which said unit would be subjected;
(f) The officers, agents, and employees of Humble Oil & Refining Company were further guilty of negligence in connection with the preparation and planning of the dryex unit, the inspection of the said dryex unit, the testing of the said unit."
The Dover Corporation was sued by plaintiff on the allegation that it was the successor by purchase of all the assets of *252 Parks Equipment Company during the pendency of this suit and was therefore liable for any judgment which might be rendered against Parks Equipment Company.
The remaining question is one of fact. Has the plaintiff substantiated his charge of negligence by a preponderance of the evidence against any or all of the defendants so as to entitle him to a judgment? A review and discussion of the proven facts are necessary in order to determine this question. A. S. Parks and Dr. William Dow developed a process useful to the oil industry and, in order to utilize it, designed what is referred to in this suit as a "dryex" unit, which is described in one brief as a "complicated mass of valves, pipes, controls and fixtures" and as "a little oil refinery". Parks and Dow had patents pending which, together with the manufacturing rights of the dryex process and unit, had been assigned by them to Delta, in return for which they were to receive a certain royalty and the requirement that certain valves and other equipment therein were to be supplied by Parks Equipment Company. A number of these units had been manufactured, assembled, tested, and sold, and were in use in the oil industry in Louisiana by Delta prior to November 13, 1958, which was the date that Humble placed an order with Delta for two dryex units for use at Duck Lake "designed to separate liquids from gaseous hydrocarbons". Prior to the purchase order with Delta for these units, Humble had requested bids for the Duck Lake units which were accompanied by specifications permitting the use of either two two-way hot valves or one three-way hot valve. The latter valve was included so as to permit Delta to bid on the unit, as it could only supply the three-way hot valves pursuant to its agreement with Parks, and that was the only way in which they could sell the units.
In the contract awarded by Humble to Delta there was an Humble inspection clause which read as follows:
"Equipment specified herein is subject to inspection and tests by our representative. Please write or telegraph, as circumstances may warrant, to Head of Shop Inspection Group, Technical Division, Humble Oil and Refining Company, Box 3950, Baytown, Texas, ten days in advance of your readiness for this inspection. Your notification should include complete order number, destination, whether oil or what part will be ready, and location of your plant. Copy of such notification shall be sent to the Humble Purchasing Department, Houston, Texas. Our inspection does not relieve you of responsibility to furnish satisfactory material, and it is furthermore understood to be our privilege to waive inspection at point of manufacture without prejudice to our right to pass on the acceptability of material at destination. The manufacturer's data reports and/or any applicable code reports will be handed to Humble's inspector or delivered as per his instructions at the time of approval of the equipment."
In due course and pursuant to the order, the dryex units were built by Delta and assembled. Humble had exercised its right to inspection from time to time but the evidence reveals that it was mainly for the purpose of testing the welding work that had been necessary in the manufacture and assembly of the unit.
On March 10, 1959, the assembly of a unit having been completed, tests were being run in accordance with the specifications by Delta in order to check for leaks and to see that the unit would withstand 1800 pounds per square inch pressure, which was one and a half times the pressure to which the units would be subjected in the field, pursuant to an amendment to the requirements of the purchase contract. In order to make this test, the units were filled with water, and pressure then built up until it reached 1800 pounds P.S.I. (per square inch). The construction, assembly and testing of the dryex units was under the charge of Don F. Jenkins, a foreman who had been *253 employed by Delta for twelve years prior to the date of the accident and who had worked on all but two of the dryex units built by Delta, which he estimated to be eighteen or twenty prior to the two for Humble. We are only concerned with, and the accident only involves, one component part of a complicated dryex unit which is called a Parks four inch three-way hot valve which is roughly described, and will be described in more detail hereinafter, as consisting of the hub, the insert, or seat, and a Yale nut which was round and on the outside three protrusions, termed "lugs", which were struck with a hammer in order to tighten or loosen this nut. Inside this nut were four threads.
Plaintiff and his co-employee, Myers, on the day of the accident were actually engaged in the testing of one of the units. At 1400 pounds P.S.I. a leak developed in the valve and in an effort to stop the leak without disassembling the valve by unscrewing the Yale nut, plaintiff and Myers decided to strike the nut with hammers, in order to tighten the union, thereby hoping to, as they expressed it, "seat" the gasket and stop the leak. In order to do this, plaintiff testified, he placed his left hand on one of the pipes and faced the valve with a four to six pound hammer in his right hand and struck a lug on the nut, from right to left. Myers got on the opposite side with a hammer in his hand so that he could alternate with plaintiff in striking the nut. They had struck the nut only a few times when an explosion occurred which resulted in the serious injuries to plaintiff.
Counsel for plaintiff bases his entire case primarily upon the following statement made at the beginning of his brief under the heading "A Mechanical Explanation of the Accident", to wit:
"Although the record in this case is voluminous and much of the testimony is highly technical the cause of the accident may be summed up in one simple expression: `the nut was too short'. To put it another way: `The threads of the nut and valve could not make contact'."
Before proceeding it is well to understand the three components that made up this valve and the way it should have been assembled according to its design and specifications which were available to Delta and how it was actually assembled by Delta. The valve consists of what is termed a hub; at the top of this hub on the inside is a groove which is designed for a metallic O-ring gasket which Delta had in its possession. This O-ring gasket fitted into this groove and came flush with the top portion of the hub, which caused no loss of thread engagement. There is next placed on the hub what is referred to as an insert and then another O-ring gasket was designed to be used. In the bottom of the nut, just below the last thread, was a flange and at the top of the hub was a flange. When the nut was raised in order to complete the union, the two flanges met and the nut was tightened by striking the protruding lugs with hammers in a counterclockwise, or from the left toward the right, direction, as it was tightened from the bottom up toward the top. Ordinarily, it tightened in a clockwise direction, if done from the top and to be screwed downward, but when this was reversed it tightened by striking in a counterclockwise direction.
The valve parts were assembled as above described except Delta had cut out in their warehouse and sent to the assembly plant two JM-60 gaskets, which are described as Johns-Manville asbestos gaskets, each one-eighth inch thick and flat rather than round, one of which was placed flat on the surface of the hub and another flat on the insert. Each of these gaskets theoretically reduced the thread engagement by one-eighth of an inch, or one-quarter total, which would cover one thread, thereby reducing the engagement of the threads by one. Actually, the gaskets would not reduce the thread engagement that much when compressed by the tightening of the hammer nut.
*254 The Yale nut (manufactured by the Yale Manufacturing Company) used in the union of this valve was a 4000 pound test-rated nut which means that it was manufactured to withstand test pressure of 4000 pounds per square inch without failure. Parks, in a letter of March 13, 1959, which will be hereafter referred to, calculated the design criteria of the Yale nut and determined that with a single thread engaged "1900 P.S.I. would be required to blow the nut off", including a safety factor of "two to one".
Counsel in support of his contention that "the nut was too short" refers to a letter which Mr. Parks, President of Parks Equipment Company, only a few days after the accident, wrote to Mr. Hal S. Phillips, President of Delta, on March 13, 1959, wherein he stated in part:
"When we add all of the factors together, the 1/6 for the short nut, the 1/3 for the flat gasket, and allow 1/6 for taper on starting thread, there is only 1/3 of theoretical strength remaining. This is obviously too close for comfort, and it appears that the loss of strength due to the flat gaskets was just too much."
We will take the liberty of producing the entire letter which is marked as Parks-16 and is as follows:
 "March 13, 1959
 "Delta Tank Manufacturing Company
 P.O. Box 1469
 Baton Rouge, Louisiana
 Attention: Mr. H. S. Phillips, President
 Dear Hal:
 As soon as possible after returning to Houston, I dug into the original
 design of our PD-1500 valve; the four inch 600° F three way as used on
 the Humble Duck Lake Units.
 Our drawing PD-1500 made May 27, 1959 is enclosed. This is the original
 design, drawn full scale, and is the valve installed on subject units.
 Part No. 23 on the drawing is the Yale Union Nut, 4000# working pressure.
 This nut holds the lower seat and bottom pipe connection in sealing engagement.
 Pressure sealing is by means of metal O-Rings No. 22.
 Checking back on design calculations, I have the following:
 Yale Union Thread is a modified Acme, four pitch.
 Body Casting was first made of Federal Steel 72-X; a high strength
 alloy steel used for high pressure valve castings. We changed to
 Quality Steel Foundry, and the bodies have since been made of their
 alloy 90-60, designated as MC-30 Steel; these two steels are comparable
 in physical properties.
 "The Quality Steel MC-30 has a tensile of 90,000 P.S.I., and a yield of
 60,000 P.S.I.; 18% elongation.
 Quality steel makes castings for the Yale Union Nuts of carbon steel
 having a tensile of 75,000 P.S.I., and a yield of 40,000 P.S.I.
 Shear strength of a single thread on the body, based on 60,000 P.S.I.
 yield is 188,000 pounds force. For a safety factor of two, this becomes
 94,000 pounds.
*255
 Shear strength of a single thread on the nut, based on 40,000 P.S.I.
 yield is 126,000 pounds force. For a two to one safety factor, this
 becomes 63,000 pounds.
 Diameter within the O-Ring seal is 6½ inches; an area of some 33.2
 square inches upon which internal pressure is exerted.
 Thus for each 1000 P.S.I. pressure within the valve, the Yale Nut
 must hold a force of 33,200 pounds. This indicates that with a single
 thread engaged, 1900 P.S.I. would be required to blow the nut off;
 this is on the basis of the two to one safety factor.
 At the time these valves were designed, dimensions for the Yale Nuts
 were obtained either by measurement of the Yale part, or by contacting
 the Yale Company direct. In the case of the six inch 4000 P.S.I.
 working pressure Nut used on the PD-1500 valve, dimensions are
 such that the length of the bore containing the threads is about 1½
 inches. Thickness of the flange on the welding Hub No. 24 is ½
 inch. Thus, maximum thread engagement length is one inch, or 4
 threads.
 To retain the valve seat No. 21, a flange was designed to come between
 the face of the Hub No. 24 and the bottom of the valve body. This
 flange is ¼ inch thick, and reduces the length of thread engagement
 to ¾ inch, or 3 threads.
 According to our calculations above, three engaged threads require
 three times 1,900 or 5,700 P.S.I. pressure within the valve to blow the
 nut off; with a two to one safety factor.
 Reports are that this nut blew off at 1400 P.S.I.; so there must be a reason.
 These valve bodies are tested to 1½ times the rated working pressure of
 1,500 P.S.I. in our shop or some 2,250 P.S.I. One fully engaged thread
 would have held the 1400 P.S.I.; so if we ignore all factors with the exception
 of internal pressure the conclusion would be that there was less than
 one thread engaged.
 Mechanical strain on the pipe would add to the force due to internal pressure,
 but such strain is indeterminate.
 Measurement of the Yale Nut from this valve indicates that there is about
 1 3/8 inch of effective bore length in this particular nut; about 1/8 inch less
 than that originally used in design. This would reduce the theoretical
 thread engagement to 2½ threads; or reduce strength by 1/6.
 On the test rack, flat gaskets were used to seal the unions instead of O-Rings
 or the Flexitallic Gaskets furnished to fit within the O-Ring grooves. These
 flat gaskets used are 1/8 inch thick, and were put in between the flat faces
 of Hub No. 24, the bottom of the valve body, and the faces of the flange
 on Seat No. 21. These flat gaskets separate the nut 23 from the body by
 ¼ inch, or result in the loss of one full thread engagement of the nut on
 the body. This would reduce the theoretical thread strength by 1/3, provided
 everything else was as it should be.
 The starting thread is tapered by the very nature of any screw thread; so
 this first, or starting thread, must be de-rated to some extent, possibly by
 as much as 50%. Doing this reduces theoretical thread strength by 1/6.
*256
 When we add all of the factors together, the 1/6 for the short nut, the 1/3 for
 the flat gaskets, and allow 1/6 for taper on starting thread, there is only 1/3
 of theoretical strength remaining. This is obviously too close for comfort,
 and it appears that the loss of strength due to the flat gaskets was just
 too much.
 The original design of the valve appears soul
 to 2,250 P.S.I. in our
 strain cannot be evalu-other
 than the use of
 Even though the design is sound, and the valves stand the pressure test,
 we have started making our own hammer nuts; in order that we may control
 dimensions more closely. These nuts provide for greater length of
 thread engagement than do the standard yale union nuts.
 If you will box up the damaged valve and ship it to us, we will replace all
 damaged parts and return it in new condition.
 The rebuilt valve will be equipped with our own hammer nut on the bottom.
 Needless to say, we are extremely concerned over this serious accident
 involving a piece of our equipment. There are no copies of this letter
 to anyone. It is for your information.
 Very truly yours,
 Parks Equipment Company
 A. S. Parks"
Counsel for plaintiff also cites, in support of his contention that the nut was too short, the testimony of Jack K. Patton, who was Delta's top man of the Oil Field Equipment Division, Engineering Department, who testified he was "pretty sure" that he had discussed the cause of the accident with Parks, "because in my opinion the nut was too short to take care of the insert that was installed between the nut and the valve body." Furthermore, this witness testified that Parks had some nuts flown in the next day which were longer to replace the short ones. Counsel for plaintiff also relies upon the testimony of W. L. Dupuy, Delta's plant manager in charge of manufacturing, who stated that he had given instructions to Don Jenkins after the accident "not to assemble any valves that a lug or a nut didn't make up over two and a quarter turns, if it made up less than two and a quarter turns not to assemble it." And he gave him such instructions "Because I felt that you were required at least two and a quarter to two and a half threads to make up to hold the pressure we were working at." Counsel for plaintiff further refers to the testimony of Millard L. Hipple, senior supervising engineer in charge of mechanical design and construction for Humble. He testified that "it was very evident by looking at the valve this morning and also by receiving the pictures and receiving the conversations of Mr. Parks and Mr. Smith that there was less than one thread engaged at the time of the failure." He also testified that after the accident they made calculations from which they concluded that because of the installation of the mating hub at the bottom port that there was insufficient *257 thread engagement as far as Humble was concerned to effect the union giving "us a factor of safety that we would ordinarily like to have." This witness was also of the opinion, on looking at a drawing of the nut (Patton 3) which he stated indicated that three full threads were engaged, and making comparison by looking at the three parts of the valve, he didn't believe "if we take the same mating hub and flange that it's possible to make up more than one thread on it." Counsel refers to the fact that Hipple while on the stand testified that the Patton 3, which is the drawing or design of the nut, was not manufactured in accordance with such drawings or plans. We believe this testimony is immaterial in the final analysis of this case.
Counsel, in order to pinpoint responsibility for the alleged failure of the nut, in his brief gave a very detailed discussion of the design and make-up of the valve connections. In effect, he states that the Yale nut, from observation, contains four threads, which is correct, and that this nut is referred to as an Acme four pitch type, which means that there is one thread per one quarter of an inch. He also states that it means that there is one revolution of the nut per one thread or per one quarter of an inch, which would make it obvious that if the interior bore of the nut makes full contact with the grooves on the face of the valve port there would be four threads of engagement, or one inch of thread engagement, which would represent four complete revolutions of the nut. Yet, he states that all parties are in agreement that at the time of the explosion there was less than one-third of engagement between the nut and the valve face. This is revealed by the thread damage to the nut. Counsel contends that by placing the hub into the bore of the nut it will be noted that there are only three threads remaining. Counsel for Parks Equipment Company disputes this fact by stating, in effect, that the thread in the nut from top to bottom is a distance of one inch and that therefore it depends on what portion of the inside of the nut you are looking at with relation to the hub and, in effect, that it would be slightly more than three threads. We do not believe in the final analysis that whether there are three full threads remaining or slightly more remaining after the hub is placed in the nut will affect the conclusion. Counsel then contends that after the bore of the hub is placed, there are three threads remaining for engagement and that the two one-eighth inch flat asbestos gaskets made by Delta in their shop, one of which was placed flat on top of the face of the hub, thereby reducing the thread engagement by one-half of a thread, and at that time leaving two and one-half threads for engagement within the bore of the nut, and there was next placed within the union the valve seat which had a flange one-quarter inch thick which consumed an area within the nut represented by one thread, which would leave one and one-half threads of the original four threads within the bore of the nut. Then the second asbestos gasket one-eighth inch flat was inserted, which represented one-half of the thread and reduced the thread engagements left to one thread. He then states that it is therefore obvious that, considering the make-up of the union, there will be at most, under most favorable conditions, only one-third of engagement at the lower port. But he contends that an additional factor came into consideration in this particular union which made even one-third of engagement impossible. That the particular Yale nut involved measured one-eighth of an inch less than that used in the original design and that this reduced the thread engagement on the union involved by an additional one-half of a thread, and therefore "it was impossible to secure more than one-half of the thread connection, subject possibly to some small differential attributed to the compression of the two flat asbestos gaskets." *258 He concludes that "it is amazing that the union could have been built up to 1400 P.S.I. before the nut blew off."
Counsel then in his brief summarizes his contention by the following statement and table in his brief:
"Taking into consideration the reduced strength of the first thread and the
two to one safety factor (which approximately offset each other) one does
not have to be a mathematician to determine that the nut blew off at about
the pressure which would be anticipated, 1400 P.S.I. In Chart Form, the
situation may be summarized as follows:
Yale Four Pitch Acme Nut Four Threads One Inch
LESS
Differential between Hub One thread One-fourth of an inch
Flange and interior shoulder
of nut.
Two 1/8 inch flat gaskets One thread One-fourth of an inch
Width of Seat Flange One thread One-fourth of an inch
Defective nut One-half thread One-eighth inch
BALANCE One-half thread One-eighth inch"
Counsel for Parks Equipment Company in his brief answers the contentions and argument of counsel for plaintiff and we take the liberty of quoting a portion thereof:
"Counsel for plaintiff suggests as a cause of the accident that the `nut was too short.'
"If counsel for plaintiff was correct in his analysis, the test pressure, of course, would have never reached 1,400 PSI without a leak occurring at the union in question. However, counsel's analysis begins with a `differential' that does not exist, and it fails to recognize that the number of turns of the nut which could be made, even with two flat JM-60 gaskets between the faces of the component parts (one and two-thirds turns) engaged sufficient thread to withstand 4,500 PSI on actual test, or 2,700 PSI for each thread of engagement.
"As we have indicated above, there was, and is, no `differential between Hub flange and interior shoulder of the nut'. None of the experts testified to any such `differential'. It appears in argument here for the first time, without support in the record, but solely through the ingenuity of plaintiff's counsel, as the very foundation of plaintiff's right to recovery as against Parks. Ingenious counsel arrives at this `differential' by contending that when the hub is inserted in the bore of the nut, `only three threads' remain. This statement is based upon observation only, and is, of course, inaccurate. If the Court will do exactly what counsel for plaintiff suggests, it will find that between three and four threads remain, dependent upon which part of the interior threaded surface of the nut is under observation.
"However, the number of threads that one may observe does not determine the strength of the closure. That which counts is the number of turns that the nut will, in fact, make. Since each one-fourth inch of threaded surface represents one turn, we have only to review the measurements of the Yale nut itself with and without the Hub inserted to determine the number of turns which can be made under any given circumstance.

*259 "By the use of an ordinary ruler, the Court can readily determine that the over-all interior depth of the Yale nut measures two (2) inches and that the interior threaded surface of the nut measures one and one-half (1½) inches from the shoulder to the outer-face of the nut. The Hub flange measures one-half (½) inch; therefore, after the Hub is inserted in the bore of the nut, there remains one inch of exposed threaded surface beyond the face of the welding hub.
"Since one-fourth (¼) inch equals one turn, this would mean that the nut would make four (4) turns, provided no other separators were placed between the faces of the component parts. The flange of the seat measures one-quarter inch, and when inserted in the bore of the valve, leaves three-fourths inch of threaded surface remaining on the nut, or three turns. Under the design for the PD-1500 as shown on Parks36, involving the use of an O-ring or narrow flexitallic gasket, there would have been no other separators to further reduce threaded surface or the number of turns which could be made. If we allow one-half turn for the starting bevel, (or the `defective nut' as counsel for plaintiff chooses to call it), we have, under design criteria, approximately two and one-half (2½) turns remaining. This is precisely what Shilstone obtained in his Test No. 1 (R. 1185).
"If we add an additional one-quarter inch for the two one-eighth improvised JM-60 gaskets, we have remaining approximately one and one-half turns, substantially the number of turns developed by Shilstone in his Test No. 3 (R. 1186).[50] In neither case do we have less than one turn, and in both instances, we have sufficient thread engagement to support a pressure far in excess of 1,400 PSI.
"To recapitulate: (with 1/4" equalling one turn)
(a) Total actual measurement of the width or depth
of the Yale nut 2 inches 2 inches
(b) Actual measurement of the shoulder of the
nut ½ inch
Remaining threaded surface 1½ inch
(c) Actual measurement of the Hub flange ½ inch
Remaining threaded surface 1 inch (or 4 turns)
(d) Actual measurement of the flange of the seat ¼ inch
Remaining threaded surface ¾ inch (or 3 turns)
(e) Allow for starting thread or bevel 1/8 inch (or ½ turn)
Turns remaining under original design criteria
 verified by Shilstone Test No. 1 2½ turns
(f) Add two one-eighth inch improvised JM-60
gaskets ¼ inch (or 1 turn)
Remaining turns after addition of improvised
gaskets contrary to specificationsverified by
Shilstone Test No. 3 1½ turns

*260 "To further illustrate, the following drawings of the interior of the Yale nut, with component parts inserted, graphically portray the measurements and turns of the nut outlined above: *261 The results of tests which were made soon after the accident by Don Jenkins, foreman for Delta in charge of the test at the time of the accident, and thereafter by A. S. Parks in the presence of Smith, engineer of Humble, and by Shilstone Laboratories completely refute plaintiff's argument that the sole cause of the accident was due to the fact that "the nut was too short." These tests also refute contention of the defendants that the proximate cause of the accident was the insertion of the two one-eighth flat asbestos gaskets assuming, of course, that the plaintiff and Myers had tightened this nut to its capacity as assembled.
The first test was made very soon after the accident at the scene by Jenkins, foreman of Delta. Jenkins testified as follows with regard to this test:
"Q Did you have a conversation with Mr. A. S. Parks at the scene of the accident?
A Mr. Dupuy had a conversation with him and then Mr. Dupuy gave me my instructions to remove the valve, to burn the piece of pipe off so we could get to the hammer nut. I don't remember if we used the same valve seat or if we burned it off. At least we didn't burn the valve seat; I'm talking about the hub. I was instructed to lay these parts on the table.
Q Did you do that, sir?
A I did.
Q Did Mr. Parks witness the breakdown of the unit that was involved after the accident?
A I'll say this, he was present.
Q Did Mr. Parks to your knowledge see the way that the valve had been assembled?
A He did.
Q Did Mr. Parks make any comment to you or anyone in your presence at that time relative to the method by which it had been assembled?
A Not that I can recall, sir.
Q Did you hear him express any criticism of the use of any gaskets rather than O-rings?
A No, sir. Mr. Parks had me to reassemble the valves using the same type gaskets, if I'm not mistaken, but the valve, the valve was reassembled. We put a mark on the nut and a mark on the valve and checked the number of turns that the nut made on the, on the valve.
Q This was the unit that had been involved in the accident?
A Yes, sir.
Q Did you use the same seat or did you have to use another one to make this test?
A We used, as well as I can remember, we used the same seat. I can't remember if we used the same hub or we took a hub out of another valve.
Q Did you use the same
THE COURT: Just one minute. Did you say that you used the same seat?
A Yes, sir, as well as I can remember.
Q Did you use the same type of gaskets that you had used?
A Yes, sir.
Q And how much turn connection could you make when you reassembled the union?
A As well as I can remember about a turn and a half or a turnI believe it ran between a turn and a half and a turn and three-quarters. Or should I say instead of a turn maybe a round?"
Also in deposition of Don F. Jenkins, taken on the 8th day of August, 1963 (filed in evidence as Parks-24, on page 41) he testified that Mr. Dupuy and "myself" looked at it. He was speaking here of *262 looking at the valve and the nut. And he further stated:
"And Mr. _______ as well as I can remember, at the time Mr. Parks even asked me to run the nut back up on the valve. And we ran it back up after we had cut the hub off of the pipe. And we were primarily interested in how many turns the nut would make on the valve. And we checked this valve. And then they decided to cut downto cut some more valves off. And we took those with the gasket and with your insert that went in the valve. And we were getting aroundoh, to the best of my knowledgeone and three-quarter inch turns. In other words, the nut would go around the valve one and three-quarter inch turns, and
Q. When you say one and three-quarter inch, you mean it would make one and three-quarter turns?
A. I meant one and three-quarter turns. I'm sorry, I didn't mean inch then."
On April 10, 1959, Mr. Parks, Mr. Gibson Smith, engineer employed by Humble prior to and at the time of the accident, and a Mr. Walker conducted a test utilizing the valve body that figured in the accident, a hub which was a so-called blind hub, that is normally used for testing purposes. They had to use a different new Yale nut that Mr. Parks had in stock, but it was selected so it would be as similar as: "we could
"we could as experienced engineers, as similar as we could make it to the valve, to the nut, that figured in the accident. This was because the nut that figured in the accident was so damaged that it could not screw onto the valve body. Now the other ports of the valve were closed with blind hubs and nuts that Mr. Parks had in stock and we did not bother to particularly select those nuts because they were sort of outside the thing that we were interested in.
Q Now was there anything other than the hub between the valve body and the nut on the larger port?
A Yes. There was the seat and its flange.
Q Where there any gaskets?
A We did not use gaskets. We used rubber O-rings for sealing purposes.
Q I now show you exhibit Parks-38 and ask you if that is the type of Oring that you utilized?
A Yes, it is.

* * * * * *
Q To what test pressure did you get the valve before there was any failure?
A We got it up to 4800 pounds.
Q And how much thread engagement did you get using those two rubber O-rings?
A We got approximately one and three-eighths threads of engagement, not counting the threads that were already practically useless.
Q Now did youwhat threads on the valve body were practically useless?
A There's approximately somewhere between a quarter and a half of a thread farthest away from the main part of the body which apparently were damaged during the accident.
Q So that as I understand your testimony, if the valve body had not been damaged in the accident you would have gotten one and two-thirds to one and seven-eighths of closure, is that correct?
A Approximately, yes."
Under further questioning by Mr. Kean, this witness testified as follows:
"Q Mr. Smith, dealing specifically with the test that you made on April *263 10th, did you measure the hammer nut identified as P-2 which was shown to you as having been involved in the accident and then make comparison measurements with the hammer nut that you used in the test?
A Yes.
Q And what measurements, what comparable measurements did you make?
A As best I can recall, we measured the depth of the threads that would be engaged, that possibly could be engaged, the inside diameter of the threads which would be the thread crests on the nut, the overall depth of the nut on the outside, the amount of beveling on the thread starting. That's all I can remember now.
Q Do you recall measuring the dimensions of the shoulder?
A Yes. You're right. Yes.
Q So at least to the extent it was possible to do so with Yale stock nuts you had for test purposes the hammer type nut which was substantially the same as the one involved in the accident?
A Yes, sir.
Q Now did you measure the hub that had been represented to you as being involved in the accident for the purposes of making comparisons with the hub that you used in the test?
A Yes.
Q Did you do the same thing with respect to the valve seat and the valve seat flange? That is, did you make comparisons by measurements of the one alleged to have been involved in the accident and the one used in the test?
A Yes.
Q Now exactly what type of test did you conduct on April 10th using the valve body which has been identified here as P-5?
A We ran a complete hydrostatic test on the valve body.
Q How was that test accomplished?
A Well, after putting on all the blind hubsof course one of the hubs was not exactly blind because it had a connection through which we introduced the pressure. It's still called a blind hub for convenience. We had to, of course, close the stem opening. After closing all four of those openings we filled the valve with water and carefully tipped the valve around so that we got rid of all of the air that was in the valve, and then pumped up the pressure with a special high pressure pump with a gauge, with a pressure gauge attached. We did not have a pressure chart or pressure recorded on it. And we kept pumping up the pressure until we got to 4800 pounds, at which time the O-ring which was between the valve body and the seat flange gave way. The reason it gave was that the nut that was on that port sheered away from the body just enough to allow the rubber O-ring to come out of its seat and break.
Q When you use the word `sheered' with reference to the hammer nut you were using in the test, you don't mean by that that the hammer nut physically came off of the valve body?
A That's right. It didn't come all the way off, it came off possibly ait moved approximately a thirty-second of an inch and that movement of a thirty-second of an inch wasn't all the way around the complete circumference, it was just on one side. In other words, it happened to turn out to be the weakest part of that particular closure.
Q And that failure occurred at 4800 pounds per square inch of pressure?
A Yes, sir."
*264 Mr. Herbert M. Shilstone, Jr., senior director of Shilstone Testing Laboratories which is concerned with inspection and testing of materials, products and devices so as to determine the strength of such materials, the hardness of materials and the pressure which such materials will be capable of withstanding, made three such tests. One test was to obtain the strength or breaking point where the metallic O-rings were used, although in the tests they actually did not use metallic O-rings but a metallic gasket which, in the opinion of Shilstone, would accomplish the same result. The results of these three tests were given by Shilstone in his testimony as follows:
"Q Now will you give us then the results of the test which we will call test number one, and that is the test without any of the gaskets?
A After making up the threaded sorry. After making up the hammer nut as tightly as it could be made up by beating with a five pound hammer, which was true for all tests, the threads stripped under a load of 217,500 pounds, considering the six inch or considering the area at the hub I'm sorry, at the union that would have been subjected to hydrostatic pressure, this area being right at 33 square inches. This tension load of 217,500 pounds would have been the equivalent of 6500 PSI internal hydrostatic pressure.
Q Would you state how many turns of the Yale nut you were able to make in this
A I did.
Q particular test?
A The hammer was turned two and one-third revolutions to make up to this utmost tightness.
Q Can you describe the damage that you found on the component parts of that union following the completion of the test number one?
A The starting thread and the second thread on the threaded body were stripped off for a perimeter of about 260 degrees. The starting thread on the hammer nut was stripped off to about 180 degrees. These degrees that I give have not been accurately measured but are estimated.
Q Now in connection with test number two, what number of turns did you achieve with the gasket on the parts and what results did you find, sir?
A Test number two involved the use of two one-sixteenth inch thick gaskets. To make it up it required one and five-sixths turns. It parted at a tensile load of 170,000 pounds, which would have been equivalent to an internal hydrostatic pressure of 5050 pounds. The damage done resulted in the starting thread and the second thread of the threaded body being stripped to about 260 degrees and the starting thread on the hammer nut was stripped to about 60 degrees.
Q How many turns of the hammer nut were you able to achieve in test number three and what were the results obtained and the damage found following that test?
A This involved the use of two one-eighth inch gaskets. The turns was one and two-thirds. The tension load at failure was 148,750 pounds, being equivalent to an internal hydrostatic pressure of about 4500 PSI. The damage that was done was the starting thread on the threaded body was stripped for about 90 degrees, the second thread on the valve, on the body, was stripped to about 190 degrees, and the end threads on the hammer nut were only slightly deformed."
The above tests stand unrefuted in this record and must be accepted. The Parks and Smith test of this valve with the proper O-ring gaskets for which it was *265 designed withstood a test of 4800 P.S.I. Also using Parks' calculation and design criteria of the Yale nut which he determined was a single thread engaged "1900 P.S.I. would be required to blow the nut off", including a safety factor of "two to one" and approximately one and one-half turns and the Yale nut with two flat improvised Delta JM-60 gaskets would make at least one and a half turns, one and three-fourths actual turns, according to Jenkins and one and two-thirds turns, according to Shilstone (test number three) the failure pressure of one and a half would be one and a half times 1900 or 2850 P.S.I. With the two one-eighth inch Delta gaskets out, another turn of thread engagement would be made and failure pressure would come to a total of 4750 P.S.I., which compares most favorably with and is very near the 4800 P.S.I. recorded in the test witnessed by Gibson Smith, Humble's engineer, in which the damaged valve body was used, supra. These tests destroy plaintiff's contention that "the nut was too short" and, hence, the many charges of negligence against the defendants in this case because all are based upon such a theory, as improper design, insufficient thread engagement, that the defendants or their executive officers, directors and/or stockholders knew or should have known of the defective design, as well as the engineers representing Humble who, in fact, had no control or supervision of these tests but could witness the results and force any corrections of defective workmanship, etc., before acceptance, and had no control and owed no duty to the plaintiff in this case that was violated.
The results of these tests also are unrefuted. If the valve had been properly assembled, there would have been no accident, and even with two one-eighth inch flat JM-60 gaskets used, there would have been a sufficient thread engagement to have easily withstood 1400 pounds P.S.I., which was approximately the pressure at the time of the accident.
We do not find that any of the defendants have been proven guilty of any negligence which was the proximate cause of this unfortunate accident.
It is true that most of the witnesses agreed that at the time of the accident there was approximately only one-half thread engaged. This is proof of the contributory negligence of the plaintiff and his co-employee for there is no reason whatsoever for the nut not to have had more than one-half thread engagement unless plaintiff and his co-employee reduced the thread engagement when they hammered the nut. Under all the tests made the nut had from one and a half to one and three-fourths turns using the same asbestos JM-60 gaskets that were being being used when the accident occurred and if it had one and one-half turns of thread engaged as previously stated, it would have withstood 2850 P.S.I. Therefore, if it only had half a thread engaged, it would not have withstood the 1400 pounds pressure prior to the time it was struck. The plaintiff was not a green hand at testing high pressure machinery, although he had not worked long at pressure testing the dryex units. There is no doubt that the preponderance of the testimony from Delta's own witnesses and other experts is to the effect that the pressure should have been reduced before attempting to strike the Yale nut. Had this been done there would have been no accident. The procedure used by plaintiff and his co-employee of striking this nut under 1400 pounds of pressure, without reducing it, was described by all witnesses who are competent as being "bad practice" and "dangerous". "It should not be. It would be very poor practice. It would be foolhardy, unsound, unsafe."
We are convinced from the testimony of plaintiff that he and Myers, in an attempt to tighten the nut, struck the lugs in a direction from right to left, with four to six pound hammers, and thereby unscrewed or loosened the nut and union.
*266 without reducing the pressure which was 1400 P.S.I. at the time, thereby causing the explosion, accident and resulting injury to plaintiff.
The defendants were free of any negligence contributing to or a proximate cause of the accident. It was brought about solely by the contributory negligence of the plaintiff.
For the above and foregoing reasons the judgment of the trial court is affirmed as to all defendants in whose favor judgment was rendered in the trial court dismissing plaintiff's suit. The judgment of the trial court in favor of the plaintiff and against the defendant, Hartford Accident & Indemnity Company as the insurer of the executive officers, directors and stockholders of Delta Tank Manufacturing Co., Inc., is hereby annuled, set aside, and reversed and plaintiff's suit dismissed at his costs.
There is one more matter which must be consideredcounsel for Parks Equipment Company in its prayer contained in an answer to the original petition of plaintiff and in a third party petition, filed on August 21, 1962, prays:
"Respondent's rights as against its insurer, The Travelers Insurance Company not only for full indemnity against any and all judgments as might be rendered herein either in the main demand or in any third party demand, but for respondent's claims and rights to be reimbursed for all loss or damage caused by Traveler's refusal to recognize and accord coverage and defense of the main demand and third party demand herein, be reserved to respondent as against Travelers."
On appeal the same request is made by Parks Equipment Company and in answer thereto counsel for Travelers Insurance Company in its first supplemental brief (Page 21) states:
"In the brief of Parks Equipment Company, the contention is made that Travelers had the duty to defend Parks Equipment Company once the Court of Appeal held that the exception of no cause of action of Travelers should be overruled. This is incorrect and in direct conflict with the decision of this Court in the case of Smith vs. Insurance Co. of State of Pennsylvania, 161 So.2d 903 (La.App. 1st., 1964) (writs denied 246 La. 344, 164 So.2d, 350 (1964). In the Smith case, this Court specifically held that there is no obligation on the part of a liability insurer to defend an alleged insured where the insurer successfully urges that there is no coverage under its policy for the person claiming coverage."
In view of the holding of this court that it is bound by the majority opinion of a previous panel of this Court (see Thibodeaux v. Parks Equipment Co., La.App., 140 So.2d 215) which overruled an exception of no cause of action based upon Travelers' contention that the policy provided no coverage and Traveler can only obtain a reversal of this decision by application to the Supreme Court upon final judgment herein on the merits, we will reserve the right requested by Parks Equipment Company.
Accordingly, it is further ordered adjudged and decreed that any and all rights which Parks Equipment Company may have "* * * for respondent's claims and rights to be reimbursed for all loss or damage caused by Travelers' refusal to recognize and accord coverage and defense of the main demand and third party demand herein, be reserved to respondent as against Travelers."
Affirmed in part and reversed in part.

On Rehearing.
On March 9, 1960, Herman Thibodeaux, the petitioner, filed this suit against Parks Equipment Company and its liability insurer, The Travelers Insurance Company, for *267 damages arising when an alleged defective valve which was manufactured and sold by Parks Equipment Company to Delta Tank Manufacturing Company caused an explosion resulting in personal injuries to petitioner.
The defendant, The Travelers Insurance Company, filed an exception of no cause of action based upon the ground that its policy specifically excluded products hazard liability and, therefore, the policy did not afford coverage under the circumstances of this case. The Lower Court maintained the exception, however, in a split decision rendered by this Court and reported in 140 So. 2d 215 et seq., we reversed the Lower Court, thus dismissing the exception. Travelers applied for writs to the Supreme Court. This application was denied by the Supreme Court which said:
"Writ refused. The judgment is not final. However, our refusal of this writ is not to be construed as an indication that we approve the result on the exception of no cause of action."
Travelers then refused to defend the action, and Parks Equipment Company reserved its rights for damages against Travelers for this refusal. The case was subsequently disposed of upon the merits.
The matter is now before us on a rehearing granted limited to the question of coverage by Travelers Insurance Company and the reservation of rights by Parks Equipment Company for reimbursement for damages caused by Travelers' refusal to defend. This is the identical question which was decided in our prior opinion which is reported in 140 So.2d 215 et seq.
The prior ruling by this court on the question presented is the law of the case insofar as this court is concerned. In Cloud v. Cloud, La.App., 145 So.2d 331, commenting upon the law of the case the Court said:
"The complicated facts and legal proceedings surrounding this litigation were detailed in an earlier appeal to this court, when we overruled an exception of no cause of action and remanded this suit for trial on the merits. La.App., 127 So.2d 560. In our opinion on the first appeal we decided against the defendants on their first two contentions above listed. Our decision of these identical issues on the first appeal in this same suit between the same parties provides the `law of the case' on this second appeal; we need not consider and decide again what has been previously decided in this same suit, as our earlier decision of the same issues in the first appeal is binding on the parties in this court on this second appeal. See Keller v. Thompson, La.App. 3 Cir., 134 So.2d 395, certiorari denied." Emphasis ours.
In Keller v. Thompson, La.App., 134 So.2d 395, the Court said:
"This principle has application in Louisiana. `With respect to an appellate court the doctrine prevailing is that its final ruling on an exception is the "law of the case" as to the point covered', if after the remand the same point is re-urged upon a second appeal to such court on the merits, Louisiana State Bar Ass'n v. Theard, 225 La. 98, 72 So.2d 310, 313. See: City of Gretna v. Aetna Life Ins. Co., 207 La. 1085, 22 So.2d 658; Hoey v. New Orleans Great Northern R. Co., 164 La. 112, 113 So. 785; Davis v. Lewis & Lewis, La.App. 1 Cir., 72 So.2d 612 (certiorari granted, but this issue not discussed, 226 La. 1059, 78 So.2d 173 and 226 La. 1064, 78 So.2d 174)."
Furthermore in Murphy v. Fidelity and Casualty Co. of New York, La.App., 165 So. 2d 497, the Court said:
"The prior opinion of this court has thus disposed of the question of negligence by deciding that the failure to keep the electrical wiring in repair, imposed a liability upon the owners of the buildings for the damages occasioned thereby. Thus our former decision on this phase of the suit has become the law of the case and is no longer an issue. Keller v. Thompson, La.

*268 App., 134 So.2d 395 (3rd Cir. 1961); Louisiana State Bar Ass'n v. Theard, 225 La. 98, 72 So.2d 310 (1954); City of Gretna v. Aetna Life Ins. Co., 207 La. 1085, 22 So.2d 658 (1945); Hoey v. New Orleans Great Northern R. Co., 164 La. 112, 113 So. 785 (1927): Davis v. Lewis & Lewis, La.App., 72 So.2d 612 (1st Cir. 1954) (cert. granted but this issue not discussed), 226 La. 1059, 78 So.2d 173 (1954) and 226 La. 1064, 78 So.2d 174 (1954)."
It is, therefore, well established that the issue decided by this court in its prior decision is the law of the case insofar as this court is concerned, and said issue cannot be considered a second time by this court. The matter may, however, be considered by Supreme Court on writs of certiorari.
For the reasons assigned the prior decision is hereby affirmed.
Judgment affirmed.
NOTES
[1] I am still of the firm opinion that there was no coverage and that the majority opinion in the cited case was and is erroneous.
[50] This is also substantially the number of turns Jenkins had obtained in his make up of the union. Jenkins deposition, p. 41.